PUROLATOR PRODUCTS CORP., Plaintiff,

v.

ALLIED–SIGNAL, INC., Defendant.

Civ. No. 90–1060L.

United States District Court, W.D. New York.

Aug. 16, 1991.

Theodore L. Garrett, Covington & Burline, Washington, D.C., and Michael R. Wolford, Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., for plaintiff.

Philip H. Gitlen, Whiteman, Osterman & Hanna, Albany, N.Y., for defendant.

## DECISION AND ORDER

LARIMER, District Judge.

### PROCEDURAL BACKGROUND

This action involves a dispute between two companies as to their respective liability for clean-up costs for hazardous substances that were deposited at a manufacturing facility in Elmira, New York. Both companies, or their predecessors, had some connection with the premises. There were two agreements, however, with indemnification provisions, that must be interpreted to determine whether and under what circumstances liability may be shifted from one party to another.

Plaintiff, Purolator Products Corp. ("Purolator"), brought this action under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., to recover "response" costs incurred in connection with a federally-mandated investigation and cleanup of chemical wastes generated by the corporate predecessor of defendant, Allied–Signal, Inc. ("Allied"), and a declaratory judgment that Allied is liable for such costs.

Allied has moved for summary judgment dismissing the complaint. Also pending before the court is Purolator's cross-motion for partial summary judgment on liability only.

### FACTS

Purolator was known prior to 1989 as Facet Enterprises, Inc. Facet was a wholly-owned subsidiary of Bendix Corporation from 1975 to April 1, 1976, when Bendix divested Facet. Allied was known as Allied Corporation until 1987. Allied acquired Bendix in 1983.

As part of its Motor Components Division, Bendix ran an automotive parts factory in Elmira, New York from 1929 to 1975. Bendix allegedly disposed of hazardous substances there.

Bendix created Facet in 1975 in response to a Federal Trade Commission antitrust order. In 1976, Bendix transferred the Elmira plant to Facet, which continued to run the plant.

After the Environmental Protection Agency listed the plant on its National Priorities List in 1982, Facet and Allied entered into an administrative consent order with the EPA in May 1986. Pursuant to that order, Facet undertook its own investigation of the site, and concluded that Bendix had disposed of hazardous substances there. Purolator alleges that the EPA is expected to choose a remedy for cleaning up the site and to direct Purolator and Allied to effect the remedy. Purolator claims that it has been complying with the EPA's order, but that Allied has refused to take any action or to pay for any of the studies or other costs involved. Purolator has allegedly spent over $600,000 so far in connection with the study.

## PLEADINGS

Count I of the complaint is based on § 113(f) of CERCLA, 42 U.S.C. § 9613(f), which provides for "contribution from any other person who is liable or potentially liable" under § 9607(a). Section 9607(a) states that the owner or operator of a facility at which substances were disposed of is liable for "necessary costs of response incurred by any other person" as a result of the disposal. Purolator seeks a judgment on Count I declaring Allied liable for, and directing it to pay, Purolator's response costs relating to the Elmira investigation and cleanup. At this point, Purolator seeks judgment on liability only, with damages to be determined at a later date.

Count II states that, relying on the 1975 purchase agreement between Bendix and Facet and a 1979 agreement between Bendix and Facet relating primarily to a settlement of certain pension liabilities, Allied has demanded indemnification from Purolator for environmental liability costs at sites other than Elmira. These costs apparently relate to chemicals generated at Elmira and disposed of elsewhere prior to Facet's creation in 1975. On this count, Purolator seeks a judgment declaring that it is not liable to indemnify Allied under the Bendix–Facet agreements or for any other reason.

In its answer, Allied contends that CERCLA liability was included in the indemnification provision in the 1975 and 1979 agreements. Allied claims that although the agreements did not expressly refer to environmental liability, the indemnity provisions are broad enough to require indemnification for all expenses incurred by Allied in connection with the clean-up.

Allied's answer asserts three counterclaims, the first two of which are based on Allied's allegation that the 1975 and 1979 agreements require Facet to indemnify Bendix for any expenses resulting from claims against Bendix connected with the assets that were transferred to Facet. Al-

lied maintains that environmental liabilities were implicitly included in these provisions.

Allied's first counterclaim seeks a declaratory judgment that Allied is entitled to complete indemnification from Purolator for all environmental liabilities related to the assets transferred from Bendix to Facet in 1975. In the second counterclaim, Allied requests damages for Purolator's alleged breach of the indemnity agreements.

The third counterclaim alleges that Allied has incurred response costs in connection with the EPA order regarding the Elmira plant. Allied seeks indemnity for these costs from Purolator under 42 U.S.C. § 9613(f).

## SUMMARY JUDGMENT MOTIONS

In its motion for summary judgment, Allied relies upon the 1975 and 1979 agreements. The 1975 agreement stated that pursuant to the FTC order requiring Bendix to transfer certain of its assets to a new company, Bendix transferred

all of Bendix' right, title and interest in and to the Assets, including, without limitation, the following:

\* \* \* \* \* \*

(a) Bendix' Motor Components Division, the principal plant and offices of which are located at 18th Street at Oakwood, Elmira, New York, exclusive of the portion thereof directly involved in or related to the manufacture or sale of bicycle brakes, certain assets of which excluded portion are listed in Exhibit C attached hereto ... [1]

The agreement also stated that "Facet hereby assumes and agrees to satisfy all liabilities and obligations of Bendix, secured or unsecured (whether accrued, absolute, contingent or otherwise) relating to or arising out of the Assets (which are transferred hereby subject to such liabilities and obligations)."

---

1. The parties do not appear to have supplied the court with a copy of the exhibits to the 1975 agreement. However, the FTC order contained a list of assets of the bicycle brake business which were not to be transferred. In general, these assets consisted of office equipment such as chairs, desks, filing cabinets, etc., as well as certain machinery and other equipment, such as a dynamometer, grinding wheel, etc.

The 1979 agreement arose out of certain legal disputes between Facet and Bendix. Purolator claims that the 1979 agreement only concerned a dispute over pension plans, but Allied contends that the agreement was intended to be a "global settlement" between the parties, and that Facet assumed liability for anything not specifically excluded which related to the transferred assets.

It is clear that a dispute over pension contributions was a concern of the parties when they entered into the 1979 agreement. The 58-page agreement lists a number of specific disagreements, lawsuits, and areas of potential liability—many of which concerned pensions—which it was intended to resolve. However, it also contains more general language, stating, for instance, that the "parties have concluded that it would be in their respective best interests to settle all the disputes between them ..."

The agreement further states in § 5.01 that Facet agreed that the 1975 agreement

> includes, but without limiting the generality thereof, an assumption by Facet of, and an indemnity to Bendix and Fram [2] against, any and all liabilities arising out of or connected with the assets and businesses of Bendix or Fram divisions or subsidiaries or portions thereof transferred to Facet pursuant to the FTC Order . . .

Several additional paragraphs expand upon Facet's assumption of liability, but in general they all use the "any and all" language quoted above. It is undisputed that environmental liability was not expressly mentioned anywhere in the agreement.

Section 5.02 of the agreement also contains the following statement: "Bendix warrants and represents that it has caused to be conducted a survey of the lawyers in the Bendix Office of the General Counsel, and that it has been advised that, based on such survey, none of such lawyers is aware of any pending or currently threatened litigation or claim against Facet or against Bendix or any of its subsidiaries or por-

tions thereof Bendix or Fram transferred to Facet," except for certain specified claims, none of which included the environmental claims underlying the instant case.

Allied contends that under the 1979 agreement, Facet assumed liability for *all* liabilities, past, present and future, related to the transferred assets. Allied says that the agreement was intended to be a "global settlement" ending all disputes over the those assets once and for all. Therefore, Allied argues, Facet assumed liability for any other matter not specifically addressed in the agreement, known or unknown, relating to the assets.

Allied also alleges that Facet was aware of potential environmental liability in connection with the Elmira site in 1979, because in 1978, county and state officials visited the site and expressed concern over the storage and disposal of hazardous substances. Allied states that the officials had several contacts with Facet that year on the subject, and that the DEC also began investigating the site before the 1979 agreement was signed.

Purolator's position is essentially two-fold: first, Purolator contends that as a matter of federal law, the indemnity agreements are not enforceable as to liability for hazardous waste clean-up costs. Purolator maintains that CERCLA bars such indemnity agreements.

Second, Purolator argues that even if indemnity agreements are allowed under CERCLA, the agreements must explicitly refer to environmental liability to be effective. Purolator states that the agreements in question did not mention, and were not intended to cover, the costs at issue in this case.

## DISCUSSION

### 1. Indemnity Agreements Under CERCLA

Purolator's argument that CERCLA bars indemnity agreements between liable par-

---

**2.** Fram Corporation was acquired by Bendix in 1967. It was that acquisition that led to the FTC order which resulted in the creation of Facet.

ties is based on § 107(e)(1) of CERCLA, 42 U.S.C. § 9607(e)(1), which states:

No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

■ Purolator contends that this section prohibits indemnity agreements between parties liable under CERCLA. The law, however, is clearly to the contrary. For one thing, the statute itself states specifically that it does not bar agreements to indemnify parties for CERCLA liability. The only restriction the statute places on such agreements is that they may not be used to *transfer* liability. In other words, liable parties can contractually shift responsibility for their response costs among each other, but they may not thereby escape their underlying liability to the Government or another third party.

This construction of the statute is supported by the vast majority of the courts which have considered the question, a fact which Purolator accepts. *See, e.g., Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454 (9th Cir.1986); *Niecko v. Emro Marketing Co.,* 769 F.Supp. 973 (E.D.Mich. 1991); *Mobay Corp. v. Allied–Signal, Inc.,* 761 F.Supp. 345, 356 (D.N.J.1991); *Southland Corp. v. Ashland Oil, Inc.,* 696 F.Supp. 994, 1000 (D.N.J.1988); *Chemical Waste Mgmt., Inc. v. Armstrong World Indus., Inc.,* 669 F.Supp. 1285 (E.D.Pa. 1987); *FMC Corp. v. Northern Pump Co.,* 668 F.Supp. 1285 (D.Minn.1987), *appeal dismissed,* 871 F.2d 1091 (8th Cir.1988). These cases hold, and this court agrees, that CERCLA does not allow parties to contract out of liability vis-a-vis the Government, but does allow them to do so vis-a-vis other private parties.

Purolator relies on the decision in *AM Int'l v. Int'l Forging Equipment,* 743 F.Supp. 525 (N.D.Ohio 1990), which interpreted the section to mean that parties cannot contractually relieve themselves of liability under the Act, but that persons may contract with others *not already liable* to provide insurance or indemnity. In other words, liability may be contractually expanded, but may not be reduced or simply shifted.

The *AM Int'l* decision is clearly the minority view and, in my judgment, an erroneous one. I believe that the statute quite clearly authorizes indemnity agreements.

In addition, the legislative history of CERCLA indicates that the Act permits private indemnity agreements although the parties remain liable to the Government. A major goal which Congress sought to achieve in enacting CERCLA was "to provide for liability of persons responsible for releases of hazardous waste" and to "establish a Federal cause of action in strict liability to enable the Administrator [of the EPA] to pursue rapid recovery of the costs incurred" by the Government in responding to hazardous waste problems. H.R.Rep. No. 96–1016, Part I, 96th Cong., 2d Sess. 1, 17 (1980), 1980 U.S. Code Cong. & Admin. News p. 6119.

These and other statements in the legislative history do not suggest that the liability imposed under the Act was meant to be punitive, but that it was intended "to provide a mechanism for prompt recovery of monies expended" by the Government and "to induce such potentially liable persons to pursue appropriate environmental response actions voluntarily." *Id.* at 33, U.S.Code Cong. & Admin.News 1980, p. 6136; *see also Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86, 91 (3d Cir.1988) (CERCLA views response liability as a remedial, rather than a punitive, measure), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989).

There is no reason to suppose that allowing indemnity agreements among potentially liable parties would interfere with these goals, so long as the parties remain liable to the Government. The allocation of liability between the parties themselves

would have no effect on the Government's ability to recover its own expenses.

Moreover, Purolator's contention that the statute is meant to ensure that "polluters pay," so that they cannot force other parties to bear the costs of responding to hazardous waste problems, conflicts with Purolator's own interpretation of the statute as authorizing insurance agreements. An insurance agreement between a liable party and an otherwise non-liable party would allow the liable party to shift the response costs just as effectively as an indemnity agreement between two liable parties.

The court also disagrees with Purolator's interpretation of § 9607(e)(2), which states:

> Nothing in this title, including the provisions of paragraph (1) of this subsection, shall bar a cause of action that an owner or operator or any other person subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person.

Under Purolator's interpretation of this section, an indemnity agreement would not bar the indemnitor from bringing an action for contribution against the other party regardless of the indemnity agreement. Such a result would be inconsistent with the express authorization in § 9607(e)(1) of insurance, hold harmless, and indemnity agreements; to state that such agreements would not bar a contribution action between the parties to the agreement would of course nullify the agreement's effect.

In my view, the intent of this section is to allow parties to bring an action to enforce their contractual rights to indemnification or contribution, notwithstanding the language of § 107(e)(1). Thus, if a party that is the beneficiary of an indemnity agreement is sued by a CERCLA claimant, that party may seek indemnification from the other party to the agreement. This language ensures that Section 107(e)(1) will not be interpreted to abrogate such contractual agreements. *See Niecko,* 769 F.Supp. at 989; *Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. 1563, 1573 (E.D.Pa.1988); *Southland Corp.,* 696

F.Supp. at 1000 (CERCLA's liability provisions do not abrogate parties' contractual rights); *Chemical Waste Mgmt.,* 669 F.Supp. at 1293.

I conclude, therefore, that CERCLA does not prohibit private parties from entering into indemnity agreements. Such agreements do not absolve the parties of liability as to the Government. They may, however, form the basis of an action to obtain indemnification, and they may also be asserted as a defense in an action between the parties to the agreement.

*2. Scope of the 1975 and 1979 Agreements*

The next issue—whether the particular agreements in the case at bar cover CERCLA liability—raises several questions. First, there is Purolator's contention that an indemnity agreement must explicitly refer to environmental or "CERCLA-like" liability in order to encompass CERCLA liability. Allied claims that a broad agreement covering "any and all" liability does include CERCLA claims.

■ To some extent, both parties are correct. The case law on this subject, though not completely uniform, indicates that a settlement agreement which shows that the parties intended to resolve all their disputes involving any type of claim includes CERCLA claims, even if the agreement is framed in general terms and does not specifically refer to CERCLA or to environmental liability. *See, e.g., Mardan Corp.,* 804 F.2d 1454; *Mobay Corp.,* 761 F.Supp. at 358 n. 15; *Rodenbeck v. Marathon Petroleum Co.,* 742 F.Supp. 1448 (N.D.Ind.1990); *FMC Corp.,* 668 F.Supp. 1285. However, if the agreement appears to be limited to specific disputes or particular types of liability, CERCLA liability will be excluded unless the agreement contains a clear, unambiguous reference to such liability. *See, e.g., Mobay,* 761 F.Supp. at 357–58; *Southland,* 696 F.Supp. 994, 1002.

This rule is consistent with policies relating to the construction of indemnity agreements in general, particularly in situations involving fault on the part of the indemnitee. "[C]ontracts indemnifying a party

against his own negligence are generally disfavored," *Quintel Corp. v. Citibank, N.A.* 596 F.Supp. 797, 801 (S.D.N.Y.1984), and "are subject to close judicial scrutiny." *Niagara Frontier Transp. Auth. v. Tri–Delta Constr.*, 107 A.D.2d 450, 451, 487 N.Y.S.2d 428 (1985), *aff'd*, 65 N.Y.2d 1038, 494 N.Y.S.2d 695, 484 N.E.2d 1047 (1985).[3] For that reason, indemnification of a party for its own negligence is permissible, but only where it appears to have been the clear and unmistakable intent of the parties. *Quintel*, 596 F.Supp. at 801; *Arocho v. Town of Brookhaven*, 71 A.D.2d 635, 418 N.Y.S.2d 474 (1979), *aff'd*, 51 N.Y.2d 778, 432 N.Y.S.2d 697, 412 N.E.2d 384 (1980) (emphasis added). While CERCLA liability is strict, and is not based on negligence, I believe that the policy behind the rule regarding negligence is also applicable here.

The question, then, is relatively simple: are the indemnity agreements in the case at bar broad enough to include CERCLA liability? At the outset, it appears beyond dispute that the agreements do not expressly refer to environmental claims. Thus, if the agreements are to be applied to CERCLA claims, it can only be by virtue of their broad, inclusive wording.

■ Having reviewed the agreements, I find that the indemnity provisions are broad enough to encompass CERCLA liability insofar as such liability relates to or arises out of the assets transferred to Facet in 1975. The 1975 agreement states that "Facet hereby assumes and agrees to satisfy all liabilities and obligations of Bendix, secured or unsecured (whether accrued, absolute, contingent or otherwise) relating to or arising out of the Assets (which are transferred hereby subject to such liabilities and obligations)." There is no suggestion in this language, or anywhere else in the agreement, that the effect of this clause was limited to particular claims or types of liability. Facet clearly agreed to take the assets along with *any* liabilities that might attach to them.

The 1979 agreement is similarly worded. Although much of the agreement deals with various income tax and pension plan disputes, those sections do not in any way limit or contradict the broad indemnity agreement in § 5.01, in which Facet stated that it had assumed "any and all liabilities" arising out of the transferred assets. The sections dealing with pensions mostly concern specific obligations which the parties undertook to resolve the pension problems. However, to the extent that litigation or claims arose out of the assets transferred to Facet, § 5.01 makes clear that Facet assumed all liability.

A number of statements in the agreement show that the parties deliberately made the language broad. For example, § 5.01(a) stated that the 1975 indemnity agreement "includes, *but without limiting the generality thereof,* an assumption by Facet of, and an indemnity to Bendix and Fram against, *any and all liabilities* arising out of or connected with the assets and businesses" transferred to Facet pursuant to the FTC order (emphasis added). The 1975 agreement was also mentioned in § 7.02, in which Facet stated that it "reaffirms, accepts the validity of and covenants that it has performed or will perform" certain specified agreements, including the 1975 agreement. In addition, § 5.01(b) states that Facet agreed to pay *"all obligations and liabilities, whether firm or contingent,* arising out of or connected with the assets and businesses ..., or resulting from *any and all acts and omissions"* by those businesses (emphasis add-

---

**3.** It appears to be unsettled whether the construction of indemnity agreements in CERCLA cases should be governed by federal or state law. *Compare Mardan,* 804 F.2d 1454 (interpreting agreements in accordance with state law), *with Mobay,* 761 F.Supp. 345 (applying federal common law to interpret agreement). It is not necessary to decide that question here, however; the New York case law requiring a clear intent to indemnify a party for its own negligence is consistent with the previously-cited federal cases which require an unmistakable assumption of CERCLA liability.

It should also be noted that the 1979 agreements is expressly made governable by Delaware law. Again, however, there is no indication that this would affect the result insofar as the present issues are concerned. *See, e.g., Paoli v. Dave Hall, Inc.,* 462 A.2d 1094, 1098 (Del.Super.Ct.1983); *Sweetman v. Strescon Indus., Inc.,* 389 A.2d 1319, 1321 (Del.Super.Ct.1978).

ed). These statements plainly go well beyond pension disputes, and extend to all types of liability.

The agreement's provisions concerning particular lawsuits, when read in their entirety, do not mean that the indemnity agreement only applied to those actions. The agreement stated that the parties would take certain actions regarding this litigation "[w]ithout limiting the generality of Section 5.01 and in the interest of settling *all* disputes between Bendix and Facet" (emphasis added). The specific references to these actions, then, must be read as exceptions to § 5.01's general indemnity clause. In other words, Facet agreed in § 5.01 to assume liability for all claims relating to the transferred assets which were not specifically dealt with elsewhere in the agreement. *See Mardan Corp.,* 804 F.2d 1454 (plaintiff's argument that release related only to certain accounting issues was belied by broad language of the documents, which stated that "the parties are desirous of settling all the aforesaid claims and any other issues between them"); *Rodenbeck,* 742 F.Supp. 1448 (rejecting plaintiff's claims that release cancelled only particular prior agreements that were specified in release, since plain language of release made it abundantly clear that release barred all claims of any kind).

■ In view of the breadth of its terms, the fact that the indemnity agreement was entered into *prior* to the enactment of CERCLA does not prevent its being applied to CERCLA liability. Although parties could not be expected to have foreseen CERCLA before it was enacted, an agreement which is broad enough to encompass any and all claims, or which clearly refers to environmental liability, has been held to cover CERCLA liability. *See Mobay,* 761 F.Supp. at 357–58; *Southland,* 696 F.Supp. at 1002; Levine, *Spreading Costs for Cleaning Up Contaminated Property: Contribution and Indemnification Under CERCLA,* N.Y.S.Bar J., July/Aug. 1991, at 41, 44.

To say that the indemnity agreements are broad enough to include CERCLA liability does not end the matter, however, since the agreements refer to liability which "relates to," "arises out of," or is "connected with" the transferred assets. Thus, a determination of whether the response costs at issue here are included within the agreements depends on what assets were transferred to Facet in 1975, and on the degree to which those costs arise out of the assets.

A particular disagreement in this regard relates to Purolator's contention that much of the waste generated at Elmira came not from the transferred segments of the Motor Components Division, but from Bendix's bicycle brake and carburetor businesses. Prior to 1975, the brake business was moved to Mexico, and the carburetor business was discontinued. Since neither of these businesses was transferred to Facet, Purolator argues, the indemnity provision could not include liability for that waste.

Allied, however, contends that Facet assumed any and all liability relating to the Motor Components Division (which made the bicycle brakes and carburetors), not just liability relating to certain product lines. The only exclusion, according to Allied, was for personnel and certain specific equipment directly related to the manufacture of bicycle brakes. Furthermore, Allied says, Facet assumed all liability relating to the real property at the site, which includes hazardous wastes on the property, regardless of their source.

The chief document relating to this issue is the 1975 agreement, which states that Bendix conveyed to Facet

all of Bendix' right, title and interest in and to the Assets, including without limitation, the following:

1. All of the assets, properties, businesses, good will, rights, privileges and interests of whatever nature, real, personal, tangible and intangible, ... of, relating to, or associated with

\*　　\*　　\*　　\*　　\*　　\*

(a) Bendix' Motor Components Division, ... exclusive of the portion thereof directly involved in or related to the manufacture or sale of bicycle brakes, certain

assets of which excluded portion are listed in Exhibit C attached hereto ...

Several things are noteworthy about these provisions. First, it is clear that Bendix transferred the entire Motor Components Division to Facet, except for certain specifically excluded portions of the Division. To the extent that any liability attached to the Motor Components Division, then, Facet assumed that liability, unless it arose purely from one of the excluded portions of the Division.

That interpretation is reinforced by the indemnity clause, which states that "Facet hereby assumes and agrees to satisfy all liabilities and obligations of Bendix, secured or unsecured (whether accrued, absolute, contingent or otherwise) relating to or arising out of the Assets (which are transferred hereby subject to such liabilities and obligations)." This broad, inclusive language shows that Facet assumed liability for all of the transferred assets.

Those assets also included the real property at the Elmira plant. The agreement provided for the transfer of "All of the assets" of the Motor Components Division, "including, but not limited to, ... real and personal property ..." The plant and offices in Elmira which are the primary focus of this litigation were expressly included within those assets. Therefore, Facet assumed all liability arising out of its ownership of the real property at Elmira.

Second, the agreement shows that anything connected with the bicycle brake business was not transferred to Facet. I am not persuaded by Allied's interpretation of the agreement as meaning that only the particular pieces of equipment listed in Exhibit C of the agreement were excluded from the transferred assets, and that Facet nevertheless assumed liability relating to the manufacture of bicycle brakes in general. The agreement states that "certain assets" of the brake portion of the Motor Components Division were listed in Exhibit C. This suggests that the items were listed not to restrict the effect of the bicycle brake exclusion, but only so that it would be clear that the listed assets were considered part of the excluded brake business.

I find, therefore, that no part of the brake business was conveyed to Facet. To the extent that any liability arose *solely* out of the manufacture of bicycle brakes, Facet did not agree to assume that liability or to indemnify Bendix.

As to the carburetor business, however, Facet did assume liability. The 1975 agreement, and the FTC order as well, provided that Facet received the entire Motor Components Division, except for any portions of the Division which were expressly excluded. By assuming all liability for the Division, therefore, Facet assumed liability not only for the Division's existing operations, but for its past manufacturing activities as well. Since liability for the carburetor business was not excluded, Facet assumed all liability connected with the Motor Components Division's manufacture of carburetors, regardless of whether the Division was still making carburetors in 1975.

*3. Application of the Agreements to CERCLA Liability*

A determination of the extent to which the indemnity agreements cover the liability at issue here requires consideration of the various bases for CERCLA liability. Under CERCLA, a party may be held liable for response costs for one of several reasons, including the party's past or present ownership and operation of a facility at which hazardous substances were disposed of, or a party's having arranged for disposal of hazardous substances at a site owned by another. 42 U.S.C. § 9607(a). Liability is joint and several unless the liable parties establish divisibility of harm and a reasonable basis for apportionment of liability among themselves. *United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989).

Purolator, then, is liable for response costs at the Elmira plant because it is the current owner-operator of the plant. In that sense, Purolator's assumption of liability for the real property imposed no great-

er obligations on Purolator than CERCLA itself.

■ In addition, to the extent that wastes on the site were *generated* by assets transferred to Facet—in other words, by the Motor Components Division—Purolator has also contractually assumed liability by virtue of the indemnity agreement. Therefore, Purolator may not seek contribution for response costs related to any wastes on the Elmira site which were generated by the *transferred* portions of the Motor Components Division, since Purolator has agreed to indemnify Allied for those wastes. As explained above, that includes wastes connected with the manufacture of carburetors, since those wastes were generated by the Motor Components Division. Allied, of course, remains liable to the Government as the disposer of the wastes. The point here, however, is that Purolator has agreed to indemnify Allied for those costs and, therefore, has no right to contribution from Allied.

■ With respect to wastes at the site which were generated by any businesses that were *not* transferred to Facet, such as the bicycle brake business, Purolator is liable to the Government for response costs. However, that liability arises solely out of Purolator's status as the current owner of the site. Since Purolator did not assume liability for the brake business, "disposer" liability remains with Allied and Purolator is not precluded from seeking contributions as to these costs. There is nothing in the indemnity agreements that prevents Purolator from seeking contribution from Allied for costs relating to those wastes, based on Allied's role in having created the condition that led to the costs being incurred.

This result is consistent both with the policies underlying CERCLA and with the previously-discussed principles relating to agreements indemnifying a party for its own fault. In drafting CERCLA's liability provisions, Congress sought to spread the costs of hazardous waste cleanup among responsible parties. *Chemical Waste Mgmt.*, 669 F.Supp. at 1291. In addition, while CERCLA extends liability to a broad array of parties, it also expressly allows a

liable person "to seek contribution from other potentially liable parties, when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances." 42 U.S.C. § 9607; H.R.Rep. No. 253(I), 99th Cong., 1st Sess. 1, 80, *reprinted in* 1986 U.S.Code Cong. & Admin.News pp. 2835, 2861–62. This combination of widespread liability coupled with an express right of contribution reflects Congress' desire to balance the Government's interest in promptly recovering its costs with an equitable apportionment of cleanup costs among current and prior owners. *United States v. A & F Materials Co., Inc.*, 578 F.Supp. 1249, 1256 (S.D.Ill.1984); H.R.Rep. No. 99–253(III), 99th Cong., 2d Sess. 15–16 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin.News pp. 3038, 3038–39.

It is true that Congress left parties free to allocate liability contractually among themselves. The allowance of private indemnity agreements, however, does not mean that the court may not also consider public policy concerns in interpreting such agreements. Rather, Congress' intention to promote the spreading and equitable allocation of costs serves as a useful guide in applying the agreement to CERCLA liability, particularly since the parties themselves did not expressly address the issue in the agreement.

As stated, Congress was concerned not just with spreading liability to the greatest number of parties, but with doing so in an equitable manner which would reflect the relative culpability of the parties. To the extent that wastes were generated by any businesses that were not transferred to Facet, therefore, the indemnity agreement should not be given an expansive reading, and Purolator may seek contribution for response costs related to those wastes.

Allocation of those costs remains to be decided. The legislative history of CERCLA suggests certain criteria upon which this allocation may be based, including:

(1) the ability of the parties to demonstrate that their contribution to a dis-

charge, release or disposal of a hazardous waste can be distinguished;

(2) the amount of the hazardous waste involved;

(3) the degree of toxicity of the hazardous waste involved;

(4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

(5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(6) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

H.R.Rep. No. 253(III), 99th Cong., 1st Sess. 19 (1985), *reprinted in* 1989 U.S.Code Cong. & Admin.News pp. at 2835, 3042. These criteria have been used by other courts in contribution cases to apportion damages. *See, e.g., United States v. Northernaire Plating Co.,* 20 E.L.R. 20200 (W.D.Mich.1989); *Amoco Oil Co. v. Dingwell,* 690 F.Supp. 78, 86 (D.Me.1988), *aff'd,* 884 F.2d 629 (1st Cir.1989).

In the case at bar, further factual development is necessary before these factors can be evaluated. The precise apportionment of damages, therefore, must await further proof concerning the amount of damages, the nature and source of the hazardous waste as well as the other circumstances relevant to an equitable apportionment of response costs.

### 4. The "Warranty" Clause

▮ Purolator claims that in the 1979 agreement, Bendix warranted that it was aware of no pending or threatened claims involving any of the transferred assets, and that Bendix did not disclose the existence of any environmental claim. Purolator argues that if Bendix knew of the potential liability in 1979, it breached its warranty that no pending or potential claims existed. In the alternative, Purolator argues that if Bendix did not know of that

liability, the indemnity agreement is void on the ground of mutual mistake.

Allied denies that Bendix breached its warranty, since Bendix only said that it was not *aware* of any pending or *currently* threatened claims. Bendix, Allied argues, did not warrant that no claims would arise in the future.

Allied also contends that the failure to disclose CERCLA or other environmental liability could not have harmed Facet in any event, since the record shows that Facet itself knew about the problems at Elmira before 1979. Facet, Allied claims, simply misjudged the scope of those problems. Purolator denies this, and claims that any environmental problems that had come up at that time were minor, were not the same problems that gave rise to this lawsuit, and seemed to have been resolved by the time the 1979 agreement was signed. Purolator claims that only in 1981 did Facet discover the problems associated with Bendix's disposal of hazardous substances at Elmira.

I am not persuaded by Purolator's arguments in this regard. First, the language of the releases is broad enough to include all claims, known and unknown. Obviously any party undertaking a broad assumption of liability wants to know as much as it can about what claims exist or might arise. Nevertheless, where the language of an indemnity agreement is all-inclusive, it must be given effect. *Mardan Corp.,* 804 F.2d 1454; *Rodenbeck,* 742 F.Supp. 1448.

Facet contends that it "was only willing to indemnify Bendix if Bendix disclosed the existence of all action [sic] or potential claims that might trigger the indemnity provision." Jackson Affidavit p. 3. Had Facet only agreed to indemnify Bendix only for certain known, identified claims, however, the parties could easily have limited the indemnity provisions accordingly. Instead, the parties made the agreement applicable to "all obligations and liabilities, whether firm or contingent, arising out of or connected with the assets and businesses ..." 1979 Agreement § 5.01(b).

Second, the agreement stated only that Bendix's lawyers were not "aware of any pending or currently threatened litigation

or claim against Facet or against Bendix or any of its subsidiaries or portions thereof Bendix or Fram transferred to Facet." As Purolator itself readily acknowledges, the CERCLA claim underlying the instant case was not "pending or currently threatened" in 1979. Purolator has repeatedly asserted in its arguments to the court on other points that in 1979 *neither* party *knew* of, or could have anticipated, CERCLA liability at the Elmira plant or at any of the other sites at issue in this case. Purolator's contention on this point that Bendix knew of and concealed this liability thus contradicts its own arguments.

Moreover, aside from the fact that CERCLA did not exist in 1979, Purolator has offered no evidence suggesting that Bendix was aware in 1979 of any actual claims which were not disclosed to Facet. Even if Bendix knew of the presence of the hazardous wastes which are the subject of the CERCLA claims, that does not translate into knowledge of a "pending or currently threatened" claim.

Finally, the record establishes that Facet itself was aware of the potential for environmental liability in 1979. Purolator does not dispute the fact that Facet knew in 1979 that there had been environmental problems at the site. A September 8, 1978 Chemung County Health Department memorandum listed the Facet plant as a "potentially hazardous landfill" site. The report states that Facet had been asked to search out certain data concerning the location and types of waste which had been disposed of at the site.

Facet responded to this request in a letter dated September 11, 1978, in which Facet identified three areas which had been used for "disposal of plating waste, oil sludge, and grinding waste." Gitlen Affidavit Ex. 4. In one area, Facet stated, "All types of liquids and solid wastes were dumped.... It contains old containers, wood, metal, cinder block, and general solid waste along with various chemicals." *Id.*

In September 1978, the Division of Environmental Health of the New York State Department of Health listed the Facet plant on a " 'Hot Spots' Identification" list.

The landfill on the site was said to contain "Plating wastes, solvents and sludges." Gitlen Affidavit Ex. 6.

The DEC then inspected the sites. A letter from the DEC to Facet dated January 23, 1979, directed Facet to come up with a plan for collecting and treating leachate discharges from the three disposal areas. In a June 1, 1979 letter to the DEC, Facet outlined its plan for handling the wastes.

Purolator argues that these problems were not the same ones that gave rise to the instant case. The important point, though, is that Facet knew that there were problems at the site when it entered into the October 1979 indemnity agreement. By agreeing to a broad, inclusive assumption of liability with respect to the transferred property at a time when the environmental problems were not fully resolved, Facet assumed environmental liability for the site.

Furthermore, Facet knew when it entered into the indemnity agreement that there were potential environmental liabilities that could arise in the future. In an Annual Report from Facet to the SEC dated November 15, 1976, Facet stated the following:

### ENVIRONMENTAL REGULATION

Facet is subject to various federal, state and local laws and regulations relating to plant safety and air and water pollution.... Facet cannot predict the effect of future environmental protection or plant safety legislation or enforcement.

Gitlen Affidavit Ex. 12 at 12. Thus, Purolator cannot claim that its CERCLA liability was altogether unforeseeable. Although Facet could not have anticipated the enactment of CERCLA itself, the very unpredictability of the exact course of environmental regulation should have made Facet aware of the potential consequences of entering into a broad indemnity agreement for a site which was known to contain hazardous wastes. Facet was not a small business, but a large, sophisticated corpo-

ration which was capable of assessing the risk of future liability. It chose to take that risk as part of its settlement with Bendix.

■ Purolator also argues that if Bendix did not know of the impending liability for the wastes in question in 1979, the indemnity agreement is void on the ground of mutual mistake. This argument fails for several reasons. For one thing, the parties' unawareness of CERCLA's future enactment is not a mistake capable of voiding the agreement. As discussed above, a broad indemnity agreement can include CERCLA liability regardless of whether the agreement was entered into prior to CERCLA's enactment. *Mobay*, 761 F.Supp. at 357–58.

The alleged unawareness of the particular wastes at issue here also does not void the agreement. First, it appears that at least some of the wastes which were the subject of the 1986 EPA consent order were the same, or of the same type, as the wastes which New York State investigated in the 1970s. The 1978–79 correspondence between Facet and the DEC reveals that the landfills were known to contain, among other things, plating waste, oil sludge, and grinding waste. Gitlen Affidavit Ex. 4. The plating waste was known to have resulted from operations using chrome, tin, copper, zinc, and cadmium. *Id.*

The 1986 EPA consent order states that wastes reported at the site "include, but are not limited to, plating wastes from electroplating operations, heavy metal sludges, solvents, and oil sludges. The present constituents of these wastes include zinc, nickel, cadmium, chromium," and certain other chemicals. Reeve B. Howland Affidavit p. 5. Thus, it is clear that this was not a wholly separate problem from those which Facet had investigated in the late 1970s.

The EPA order also discussed the presence of other wastes, principally trichloroethylene ("TCE"). Relying on *Mangini v. McClurg*, 24 N.Y.2d 556, 301 N.Y.S.2d 508, 249 N.E.2d 386 (1969), which stated that "in resolving claims of mutual mistake as to injury at the time of release, there has been delineated a sharp distinction between

injuries unknown to the parties," which will permit avoidance of a release, "and mistake as to the consequence of a known injury," which will not, *id.* at 564, 301 N.Y.S.2d 508, 249 N.E.2d 386, Purolator contends that the TCE contamination constituted an "injury" which was unknown when the parties entered into the indemnity agreements.

I am not persuaded by this argument. When the parties entered into the 1979 agreement, Facet knew that hazardous wastes had been disposed of at the site. Facet also could not have been certain that it had determined the precise extent of the contamination; only a year earlier, Facet had reported to the DEC that one particular landfill had been used for disposal of "All types of liquids and solid wastes," including "general solid waste along with various chemicals." Gitlen Affidavit Ex. 4.

Aware of these facts, Facet agreed to assume liability for the site. Therefore, even if Facet did not yet know of the presence of TCE, or of the location of particular disposal sites, Purolator cannot claim that it was mistaken as to the existence of the "injury" underlying its CERCLA liability. The *Mangini* distinction between the existence and the extent of an injury was enunciated in the context of a personal injury case. However, to the extent that the rule may be applied to the case at bar, the court finds it more accurate to say that the "injury" here is not limited to the presence of particular chemicals or particular waste disposal sites. Rather, the injury is the contamination from hazardous chemicals resulting from Bendix's operation of the plant. The fact that Facet, when it entered into the broad 1979 indemnity agreement, may not have realized the extent of the contamination does not bar the enforcement of the agreement. *Mangini*, 24 N.Y.2d at 564, 301 N.Y.S.2d 508, 249 N.E.2d 386.

### 5. Liability for Other Sites

Purolator's complaint states that Allied has demanded indemnification from Purolator for sites other than the Elmira plant. In particular, there is a dispute over a lot across the street from the Elmira plant

that Bendix sold to U.S. Steel in 1971, before Facet was created. Allegedly Bendix deposited wastes on that lot that had been generated at the Elmira plant.

Purolator seeks a declaratory judgment that Allied is liable for response costs at the U.S. Steel site and at other sites which were not transferred to Facet. Allied, however, claims that Facet assumed liability for any wastes at these sites that were generated by the Motor Components Division.

It is again important to bear in mind that liability for these sites may arise from several different circumstances, and attach to several different parties. First, there is the liability of the current owner or operator, which in the case of the Elmira lot appears to be U.S. Steel. 42 U.S.C. § 9607(a)(1). Second, there is the person who owned or operated the facilities in question at the time of disposal of the hazardous substances, *i.e.*, Allied. 42 U.S.C. § 9607(a)(2). Third, a party who disposed of the hazardous substances, or arranged for their disposal, may be held liable. 42 U.S.C. § 9607(a)(3). Although the parties have not pointed to any authority that would suggest that CERCLA itself makes Purolator liable under this third category as the successor to the Motor Components Division, Purolator has nevertheless made itself liable under the indemnity agreements. Therefore, to the extent that the Motor Components Division disposed of, or arranged for the disposal of, its own wastes on any of these sites, Purolator, having contractually assumed liability for the Division, may be held liable.

As with the alleged bicycle brake wastes at the Purolator plant, then, Purolator has assumed by contract some, but not all, liability. Specifically, Purolator has agreed to indemnify Allied for response costs arising out of the Motor Components Division's disposal of wastes, but not for costs arising out of Allied's past or present ownership of the remote sites that were not transferred to Facet. The parties' indemnity agreements, therefore, impose some liability on Purolator, but do not prevent Purolator from seeking contribution from Allied as to those items not covered by the indemnity agreements.

The proper allocation of these costs, of course, is a matter that remains to be decided. As stated above, the legislative history and case law provide some guidance for apportioning damages, but the factors to be considered require more proof than is currently in the record, and summary judgment on this issue is therefore not appropriate at this juncture.

## CONCLUSION

Defendant Allied's motion for summary judgment dismissing the entire complaint is denied. As a matter of law, plaintiff, Purolator, is not entitled to seek contribution from Allied for all response costs but may seek contribution to the limited extent set out in this decision. Further proof is necessary to determine the existence of the wastes and the respective parties' responsibility for the costs involved in removing them.

Purolator's cross motion for partial summary judgment is granted to the extent that, as a matter of law, Purolator has the right to seek contribution from Allied to the extent set out in this decision. Whether Purolator can prove this must be developed at trial.

The parties shall meet with Magistrate Judge Kenneth R. Fisher to set up a schedule for completion of discovery on the issues that are relevant to the issues remaining in the case.

IT IS SO ORDERED.