NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0023n.06
Filed: January 8, 2007

No. 06-3158

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| OXY USA INC., | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| Cross Claim Plaintiff-Appellant, | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| v. | ) | KENTUCKY |
| | ) | |
| BORDEN, INC., | ) | |
| | ) | |
| Cross Claim Defendant-Appellee. | ) | |

Before: DAUGHTREY, GIBBONS, Circuit Judges; and EDMUNDS, District Judge[*]

**JULIA SMITH GIBBONS, Circuit Judge**. This case arises out of a dispute between OXY USA, Inc. ("OXY"), the successor-in-interest to Cities Service Company ("Cities"), and Borden, Inc. ("Borden") over the interpretation of a contract under which Borden acquired an ink manufacturing business from Cities. The dispute hinges on the interpretation of an assumption of obligations provision in the 1974 Agreement for Purchase and Sale ("APA") executed by the parties. The sole issue before this court is whether the trial court erred in determining that defendant Borden is not liable to indemnify OXY for costs incurred by OXY in a federally-mandated cleanup of the Skinner Landfill in West Chester, Ohio.

For the following reasons, we affirm the judgment of the district court.

---

[*]The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

OXY is a Delaware corporation with its principal place of business in Texas. Borden is a New Jersey corporation with its principal place of business in Ohio. Cities, OXY's predecessor-in-interest, operated an ink manufacturing facility in Woodlawn, Ohio ("the Levey Division"), and prior to January 31, 1974, the Levey Division disposed of waste containing hazardous substances at the Skinner Landfill in West Chester, Ohio. At no time did either Cities or OXY ever own or operate the Skinner Landfill. Borden never disposed of any waste from the Woodlawn facility at the Skinner Landfill.

After considerable negotiations and drafts, Cities and Borden entered into the final APA on January 31, 1974, and the transaction closed the same day. Both before and after the closing, three surface impoundments were located on the Levey facility property, and Borden operated these impoundments after the closing. The negotiations for the sale of the facility took place from November 1973 through late January 1974. The parties' negotiations resulted in various draft sale contracts, which ultimately evolved into the final APA.

Cities and Borden entered into the final draft of the APA on January 31, 1974. Two provisions of the APA are of particular importance to this case, Section 7 ("Transfer of Assets") and Section 11 ("the Assumption"). Section 7, in relevant part, states:

> (a) Generic Transfer: On the Closing Date, subject to the terms and conditions set forth in this Agreement, Cities will sell, convey, assign, transfer and deliver to Borden, all the assets and properties of every kind, character and description, whether tangible or intangible, and whether real or personal, wherever located, of the Levey Division (except cash, accounts receivable, claims against third parties and insurance claims, and inventories of finished products, lithographic plates and lithographic chemicals, in existence and owned by Cities on the Closing Date, Letters Patent licensed under Paragraph 4(d) hereof, contracts not acceptable to Borden as identified in Exhibit 11, and except as otherwise specifically stated herein), free and clear of all

liabilities and obligations, except only those liabilities and obligations which are to be assumed by Borden as provided herein . . . .

The final version of Section 11, the central provision of this dispute, provides in relevant part:

11. Assumption: Except if and as otherwise provided in this Agreement, subject to and as of the consummation of the Closing, Borden hereby assumes all the obligations of Cities, arising out of events occurring after the Closing Date relating to the business or assets of the Levey Division transferred hereunder, except to the extent that any such obligation arises from a breach by Cities of a warranty or covenant. Cities will continue to be responsible for all obligations arising out of events occurring prior to and on the Closing Date relating to the business or assets of the Levey Division. Cities makes no representations as to the condition of the assets transferred being in compliance with any federal, state, or local laws provided, however, that Cities represents and warrants that Cities has received no notice of any violation or claim of violation of any such law and the management of Cities including the Levey Division management has no actual knowledge thereof. Cities shall have no obligations or liabilities arising out of failure of such assets to have been in compliance prior to the Closing, with any federal, state or local law except to the extent that any such obligation arises from a breach by Cities of the foregoing warranty.

"Event" as used in Section 11 is not defined in the APA. No provision of the APA directly addresses whether Borden would assume the environmental obligations related to the Levey Division assets.

The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") was enacted in 1980. 42 U.S.C. §§ 9601-75. In 1983, pursuant to CERCLA, the United States Environmental Protection Agency ("EPA") added the Skinner Landfill to the National Priorities List after it identified releases, actual and threatened, of hazardous substances from the Landfill. See 48 Fed. Reg. 40658 (Sept. 8, 1983). It is undisputed that all costs related to the Skinner Landfill cleanup relate to incidents that transpired prior to CERCLA's enactment and before Cities (as OXY's predecessor-in-interest) conveyed the Woodlawn facility to Borden.

On March 28, 1997, Dow asserted a claim against OXY and more than 80 other parties seeking recovery of response costs under section 107 of CERCLA. Dow based its claims against

OXY on allegations that, prior to the 1974 closing, the Levey facility arranged for the disposal of waste containing hazardous substances at the Skinner Landfill and OXY was therefore obligated under CERCLA, 42 U.S.C. § 9607(a), to share in the cost of clean-up at the Skinner Landfill. Almost all of the CERCLA claims were resolved through a consent decree entered into with the United States on April 3, 2001, pursuant to which OXY and others agreed to pay certain past and future costs at the site. *See United States v. Elsa Skinner-Morgan*, Civ. Action No. C-1-00-424.

On January 5, 2001, OXY and Borden filed a Joint Motion for a Case Management Order to permit OXY to file a cross-claim against Borden seeking damages OXY had incurred to date and any future damages OXY might incur related to the Skinner Landfill. The United States District Court for the Southern District of Ohio granted the motion and on June 20, 2001, OXY filed a cross-claim against Borden citing the Levey CERCLA obligation. OXY sought damages incurred in cleaning the Skinner Landfill and in reimbursing the EPA and other Potential Responsible Parties ("PRPs") for costs incurred at the Landfill. On May 3, 2002, Borden moved for summary judgment on OXY's cross-claim, and the district court subsequently denied the motion. In denying the motion, the district court noted:

> The Court finds as a matter of law that the contractual language is ambiguous concerning whether Borden assumed liability for costs incurred in connection with the Skinner Landfill cleanup for materials deposited there prior to the Closing Date. Both parties have posited plausible and varying interpretations of the Agreement, and they have cited several cases in support of their respective interpretations. It is not apparent from the face of the contract, however, which of the reasonable interpretations the parties intended when the Agreement was drafted. Nor do the cited cases resolve the ambiguity since those cases do not establish what these parties intended when they drafted the particular Agreement at issue here. Thus, it is necessary to look beyond the four corners of the written Agreement to ascertain the parties' intention as to the assumption of liability for the cleanup costs.

The case then proceeded to a nonjury trial. On December 29, 2005, the district court issued its

5

opinion and found in favor of Borden on all claims. The district court concluded that OXY "failed to sustain its burden of demonstrating that the APA in question manifests a 'clear and unmistakable intent' to require Borden to assume liability for the environmental hazard at Skinner Landfill." The district court went on to state that "the most reasonable interpretation" of the APA language, in light of all the evidence at trial, was that the parties contemplated that the closing date of the contract would serve as the "demarcation line" for determining future liability "with Cities to retain responsibility for all liabilities arising from activity that took place on or before the transfer date, and Borden assuming responsibility for all liabilities arising from activity occurring thereafter."

II.

The district court's construction of the contract is a question of law subject to *de novo* review by this court. *Campbell v. Potash Corp.*, 238 F.3d 792, 797 (6th Cir. 2001). The existence of ambiguity in a contract is also a *de novo* question for this court. *Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 346 (6th Cir. 2005). The district court's resolution of any ambiguity based on extrinsic evidence may be overturned only if clearly erroneous. *Id.* Pursuant to Federal Rule of Civil Procedure 52(a), findings of fact by the district court should not be reversed unless clearly erroneous. Fed. R. Civ. P. 52(a). A finding of fact is clearly erroneous when, although there is evidence to support it, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)); *accord Gross v. Comm'r*, 272 F.3d 333, 343 (6th Cir. 2001). When the findings rest on credibility determinations, Rule 52 demands even greater deference. *Anderson,* 470 U.S. at 575; *Hamilton v. Carell*, 243 F.3d 992, 997-98 (6th Cir. 2001).

6

The parties agree that the APA provides that their rights and obligations thereunder are to be construed under New York law. New York law provides that it is the court's function to "discern the intent of the parties to the extent their intent is evidenced by their written agreement." *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989) (citation omitted). If the parties' intent is unclear from the writing, however, the court may consider extrinsic evidence of intent. *Slatt v. Slatt*, 64 N.Y.2d 966, 967 (1985). A court cannot find a duty to indemnify "absent manifestation of a 'clear and unmistakable intent' to indemnify." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993) (internal citation omitted). Moreover, as noted by the district court, courts applying New York law abide by the "widely accepted principle" that "indemnity agreements which purport to indemnify the indemnitee for its own fault are to be strictly construed." (JA at 104.); *see Olin Corp. v. Yeargin, Inc.*, 146 F.3d 398, 407-08 (6th Cir. 1998) (citing *Purolator Prods. Corp. v. Allied-Signal, Inc.*, 772 F. Supp. 124, 131 (W.D.N.Y. 1991)). A pre-CERCLA indemnity agreement inherently cannot expressly waive (or cover) CERCLA liability that did not exist at its drafting, but under New York law sufficiently broad contractual language can transfer unknown future CERCLA obligations. *Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 15-16 (2d Cir. 1993).

Section 11 of the APA states in clear language that "Borden hereby assumes all of the obligations of Cities, arising out of events occurring after the Closing Date relating to the business or assets of the Levey Division transferred hereunder," while "Cities *will continue to be responsible* for all obligations *arising out of events occurring prior to and on the Closing Date* relating to the business or assets of the Levey Division." OXY's obligation under CERCLA to share in the cleanup

of the Skinner Landfill directly arose from a pre-closing event: Cities' disposal of waste at the landfill. As such, OXY must retain liability under the plain language of the contract. An alternative reading of the APA requires a strained effort to arrive at an outcome not apparent from the face of the contract. *See W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) ("By ignoring the plain language of the contract, plaintiff effectively rewrites the bargain that was struck. An analysis that begins with consideration of extrinsic evidence of what the parties meant, instead of looking first to what they said and reaching extrinsic evidence only when required to do so because of some identified ambiguity, unnecessarily denigrates the contract and unsettles the law.").

OXY's reliance on *Purolator*, 772 F.Supp. at 131, is misplaced. Rather than bolstering OXY's case, *Purolator* highlights the distinction between the contract at issue in this case and the one at issue in *Purolator*. *Purolator* concerned only the breadth of the contract, i.e., whether the pre-CERCLA contract was sufficiently broad to cover CERCLA liability. *Id.* at 130-31 (finding that a "settlement agreement which shows that the parties intended to resolve all their disputes involving any type of claim includes CERCLA liability, even if the agreement is framed in general terms and does not specifically refer to CERCLA or to environmental liability"). The *Purolator* court concluded that contract language stating that one party "assumes and agrees to satisfy all liabilities and obligations" of the other party was sufficiently broad to encompass CERCLA liability. *Id.* at 131-32. Unlike the contract in this case, however, there was no temporal distinction in the *Purolator* contract: the contract said nothing of one party retaining liability arising out of events prior to the closing. Here the parties' use of the closing date as a "demarcation line" to assign liability distinguishes the APA from the contract at issue in *Purolator*.

OXY also argues that "[t]he disposal of waste in the ordinary course of business by the

8

Woodlawn plant was not an 'event'" within the meaning of the APA, and therefore did not trigger any legal obligation. OXY emphasizes the usage of "event" from the 1989 edition of *Black's Law Dictionary* and its definition including the "consequence of anything" and a "noteworthy happening or occurrence."[1] OXY then splices the definition in order to arrive at its conclusion that "an event is: 'the consequence of anything,' the 'outcome of an action as finally determined,' that in which an action 'terminates' or a 'noteworthy happening.'" (Final Br. of Appellant at 30 (citing *Black's Law Dictionary*, 498 (5th ed. 1989).) OXY goes on to note that "[a]t least one New York court has embraced a similar definition of "event," and then cites a New York case from 1851. *See Fitch v. Bates*, 11 Barbour 471, 473 (N.Y. 1851). OXY then concludes that, in line with these definitions, the "disposal of waste by the Woodlawn plant, an action which was of no consequence, was clearly not an 'event' under the plain meaning of the word."

Cities' disposal of waste, however, does fit within the plain meaning of "event."[2] The 1968 edition of *Black's Law Dictionary*, the most recent edition at the time the APA was drafted but not cited by either party, defines "event" as "[t]he consequence of anything, the issue, the conclusion, end" and "[a]nything that happens or comes to pass as distinguished from a thing that exists." *Black's Law Dictionary* 654 (4th ed. 1968). The disposal of hazardous waste fits within this broad definition. Similarly, the current edition of *Webster's* dictionary at the time of the contract drafting

---

[1] It is unclear why OXY relies on this particular dictionary definition, as it was not released until fifteen years after the parties drafted the APA.

[2] Borden asserts that "OXY conspicuously failed to devote so much as a sentence to the meaning of the phrase 'arising out of'" as used in Section 11 of the APA. Borden goes on to note how New York courts interpret "arising out of." *Id.* However, the phrase "arising out of" as used in Section 11 is still dependent on whether Cities' disposal of hazardous waste was an "event" within the meaning of the contract, and as such "arising out of" has no independent relevance to determining liability.

(also not cited by either party) defined "event" as "something that happens: occurrence." *Webster's Third Int'l Dictionary* 788 (3d ed. 1967). Again, large-scale disposal of hazardous waste fits comfortably within this definition.

OXY also contends that the district court's interpretation of "event" contradicts the meaning the parties attached to "event" in a separate provision of the APA. This argument is misleading. The APA provision cited by OXY, Section 2(n), is titled "Absence of Adverse Events" and is a guarantee that nothing negative has happened to the property in the period between the drafting date and the closing. The illustrations of "events" provided in this section, including "fire, accident, or other casualty . . . or any act of Good [sic] or the public enemy," apply only to *adverse* events as defined, not "events" without this modifier. The same provision goes on to discuss "general economic events" and "events which affect industry in general," but these other usages of "event" are not addressed (or acknowledged) by OXY. Only a neutral usage or definition of "event," not a contextual usage like that found in Section 2(n), would be useful in determining the parties' intent with regard to the usage of "event" in Section 11 of the APA. As such, any reliance on the meaning of "event" as used in Section 2(n) is misplaced.

OXY asserts that "the district court erroneously equated the term 'event' with 'activity' in concluding that pre-Closing disposal of waste was an 'event.'" OXY raises this argument based on the district court's holding that "the parties contemplated that the Closing Date would serve as the demarcation line for determining future liability, with Cities to retain responsibility for all liabilities arising from *activity* that took place on or before the transfer date, and Borden assuming responsibility for all liabilities arising from *activity* occurring thereafter." (JA at 105 (emphasis added).) This statement does not, however, necessarily imply that the district court "used 'event'

10

and 'activity' interchangeably," as OXY alleges. Instead, this wording merely reflects the district court's conclusion as to the meaning of the provision and the court's finding that OXY remains liable for pre-closing dumping; the district court need not quote the language of the contract in every passage.[3]

There is ample evidence in the record to support the district court's conclusion that OXY retained liability. Several Borden employees, including its then-vice president Jon Casey and in-house counsel Paul Josenhans, testified extensively as to Borden's non-assumption of liability at the Skinner Landfill. Moreover, the evidence presented by OXY is not convincing. OXY notes various statements by Cities' employees, but none provides any resolute evidence that would support a finding of clear error. Some evidence emphasized by OXY is not relevant, like the testimony of Dr. Hellwig (who led Cities' negotiating team) that Cities wanted to sell the Levey Division because it "wanted to get out of the business." Other OXY evidence focuses on the drafting history of the APA, but this ultimately demonstrates little more than the OXY representatives' personal interpretations of the negotiations. OXY also relies on various contemporaneous notes and memoranda for the proposition that "Cities wanted no obligations 'hanging over.'" These notes, however, do nothing to affect interpretation of the APA. OXY does little more than cite various

---

[3]OXY also asserts that the district court's interpretation of "event" fatally conflicts with the warranty clause in Section 11. Cities' limited warranty that it had no knowledge that it was in violation of state or federal law does not, however, circumvent the plain language of other sections of the contract provision. *See Buffalo Color Corp. v. AlliedSignal, Inc.*, 139 F. Supp. 2d 409, 424-25 (W.D.N.Y. 2001) (finding that one company's purchase of another company "as is" does not result in an assumption of CERCLA liability: "If the parties intended such an indemnity, they could have drafted appropriate specific language to reflect this intent, or—quite simply—they could have drafted all-encompassing broad language . . . ." (citation omitted)). Moreover, the warranty covers only the "assets transferred." By its plain language, then, the warranty does not cover dumping or any subsequent release.

personal notes of OXY officials and then liberally interpret these notes in its favor. Even if OXY's evidence permitted a finding contrary to that of the district court, this would not be the basis of a finding of clear error. *Anderson*, *N.C.*, 470 U.S. at 573-74 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."); *see also Fuji Kogyo Co., Ltd. v. Pac. Bay Int'l, Inc.*, 461 F.3d 675, 687 (6th Cir. 2006).

IV.

OXY also argues that the "unequivocal language of the APA demonstrates that Borden purchased the on-going business of the Levey Division." OXY asserts that the district court erred as a matter of law when it concluded that Cities did not transfer the Levey Division to Borden as an ongoing business. The district court found that "Borden did <u>not</u> purchase 'the on-going business of the Levey Division,' but rather purchased only selected assets of that entity." The language in the APA is consistent with this interpretation. Section 1(b) of the APA states that Borden purchases only "those certain assets of the Levey Division more particularly set forth in Paragraph 7." That section then details various Levey assets *not* included in the sale: "Expressly excluded from the assets to be conveyed hereunder are all Levey Division accounts receivable outstanding as of the Closing Date, all cash, claims against third parties and insurance claims, and inventories of finished products consisting of finished inks and related products, lithographic plates and lithographic chemicals in existence and allocable to the Levey Division as of the Closing Date . . . ." Further, it is clear that the district court weighed the extrinsic evidence and arrived at the conclusion that Borden purchased only certain assets.

Even if Borden had purchased the Levey Division as an ongoing business, this would not inherently be determinative of environmental liability. As discussed above, Section 7 of the APA

provides that Cities transferred assets of the Levey Division to Borden "free and clear of all liabilities and obligations, except those liabilities and obligations which are to be assumed by Borden as provided herein." Section 11 further states that "Cities will continue to be responsible for all obligations arising out of events occurring prior to and on the Closing Date relating to the business or assets of the Levey Division." Even if Borden had purchased the ongoing business of the Levey Division, this would not overcome the parties' negotiated agreement.

V.

For the foregoing reasons, we affirm the judgment of the district court.

13