**VELSICOL CHEMICAL CORPORATION, Plaintiff,**

**v.**

**REILLY INDUSTRIES, INC., Defendant.**

**No. 1:96–CV–437.**

United States District Court, E.D. Tennessee, at Chattanooga.

June 30, 1999.

James W. Gentry, Jr., Spears, Moore, Rebman & Williams, Chattanooga, TN, for plaintiff.

Harry F. Burnette, Burnette Dobson & Hardeman, Chattanooga, TN, Robert B. Ellis, Reed S. Oslan, Geoffrey S. Irwin, Kirkland & Ellis, Chicago, IL, for defendant.

## MEMORANDUM AND ORDER

COLLIER, District Judge.

Plaintiff Velsicol Chemical Corporation ("Velsicol") initiated this private party cost recovery action against Defendant Reilly Industries, Inc ("Reilly"), pursuant to the Comprehensive Environment Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 42 U.S.C. §§ 9601–9675. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and CERCLA. Plaintiff seeks reimbursement for past, present, and future costs incurred in responding to the release or threat of release of hazardous substances into the environment as a result of alleged activities conducted by the Defendant on property located at 4902 Central Avenue, Chattanooga, Hamilton County, Tennessee ("the Reilly property" or "the site"). Velsicol seeks to hold Reilly liable for costs pursuant to 42 U.S.C. § 9607(a)[1] and in the alternative seeks contribution from Reilly under 42 U.S.C. § 9613(f)[2].

The matter proceeded to trial without a jury on Monday, January 4, 1999 and concluded on Wednesday, January 20, 1999. The Court heard testimony from nineteen witnesses: C. Lynn Sharpe, Garland Watson, Robert Thiel, Walter Daniel Phelps, Johnie M. Apple, Gregory Paul Roush, Neil R. Mitchell, Nicholas Charles Crawford, Robert Morris (by Deposition), Walter Thomas Varnell, Nancy Van Eman, Michael Poe, Dr. Raymond D. Harbison, Gary Hermann, Dietmar Olesch (by Deposition), Carl Frank Lesher (by Deposition), William Albert Justin (by Deposition), E.L. Kittrell Smith and Robert Polack. The Court received into evidence a large number of exhibits.

After carefully considering the testimony of witnesses, exhibits introduced at trial, arguments of counsel and supporting memoranda, and the applicable law, the Court makes the following findings of Fact and Conclusions of Law pursuant to *Fed. R.Civ.P.* 52(a)[3].

### FINDINGS OF FACT

1. Subject matter jurisdiction in this case exists pursuant to the CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601–9675, and 28 U.S.C. § 1331 because this action involves a substantial federal question. The Court also has subject

---

1. CERCLA § 107(a)

2. CERCLA § 113(f)

3. Rule 52(a) states:

   Effect. In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. It will be sufficient if the findings of fact and conclusions of law are stated orally and recorded in open court following the close of the evidence or appear in an opinion or memorandum of decision filed by the court. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56 or any other motion except as provided in subsection (c) of this rule.

matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and there is diversity of citizenship between the parties.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b) because Velsicol maintains a facility in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

3. Plaintiff Velsicol is a Delaware corporation with its principal place of business in Rosemont, Illinois (Amended Complaint "Am. Compl.," Court File No. 21, ¶ 4).

4. Defendant Reilly is an Indiana corporation with its principal place of business in Indianapolis, Indiana, and is the same entity as the former Reilly Tar and Chemical Corporation (*Id.* at ¶ 5; Answer, Court File No. 24, ¶ 5).

5. From October 1963 to the present, Velsicol and/or its predecessors in interest has owned and operated a chemical manufacturing plant in the southwestern portion of the City of Chattanooga on Central Avenue (Am. Compl. ¶ 17; Transcript "Tr.," Court File No. 147, Sharpe, pp. 48, 53).

6. From sometime in and around 1916 until 1975 Reilly and/or its predecessors, owned and operated a coal tar distillation manufacturing facility contiguous to a coking operation in the southwestern portion of the City of Chattanooga (Plaintiff's Exhibit, "PX," 20).

7. Prior to 1963, a now defunct corporation known as Tennessee Products & Chemical Corporation owned property which completely surrounded the Reilly Tar facility. A coking operation (from which Reilly Tar received its raw material), a fine chemical operation (which Velsicol purchased in 1963), and a ferro-alloy plant were located on this property (Tr., Sharpe, pp. 48–49, 53).

8. After Velsicol purchased the fine chemical portion of Tennessee Products, Woodward Iron Company purchased the coking operation. Tennessee Products continued to lease the property containing the ferro-alloy plant from Velsicol after October 1963 until early 1965, when those operations were moved to North Alabama and the building itself was razed (*Id.* at 55).

9. When Velsicol purchased the fine chemical manufacturing portion of Tennessee Products, it continued to manufacture certain chemicals which Tennessee Products had manufactured prior to the sale. The major raw materials used by Tennessee Products and Velsicol after it acquired the property were toluene and chlorine. Both Tennessee Products and Velsicol produced chlorinated toluene products (*Id.* at 50, 53–54). Velsicol, however, changed management after the purchase and added certain additional products, including a very successful hormonal herbicide known as Banvil (*Id.* at 54). The Banvil plant was constructed in 1963 and was located in the southwest corner of the Velsicol complex (*Id.* at 50, 89).

10. At the time Velsicol purchased the chemical manufacturing portion of the Tennessee Products facility, the Reilly Tar property (consisting of five acres) was located on a portion of ground in the Tennessee Products complex which was completely surrounded to the west, south and east by the newly purchased property of Velsicol and to the north by the coking operation of Tennessee Products (which was sold to Woodward), separated only by a railroad track operated by the Central of Georgia Railroad Line and a fence line (*Id.* at 85–89). Reilly was afforded ingress and egress to its facility by means of a road (an easement) located (prior to 1963) on Tennessee Products' property and, thereafter on Velsicol property (Tr., Morris, p. 654).

11. Reilly was located next to the coking operation because at the time it began operations it was good business practice to locate coal tar plants next to a coke plant (Tr., Varnell, p. 666). In its operation, Reilly distilled coal tar down pitch and creasote oil. In addition to conduct-

ing a coal distillation operation, Reilly conducted a blending operation. The distillation process results in distillates of light oils, principally benzene, toluene, xylene and naphthalene (*Id.* at 664–65). These chemicals are classified as poly nuclear aromatic hydrocarbons ("PAHs") (Tr., Watson, pp. 121–22).

12. The topography of the ground on which the Velsicol facility and the former Reilly property are located is such that the ground surface slopes downward from the Velsicol property onto the Reilly property (PX 124, 125). Consequently, water and other liquids would flow from the Velsicol property onto the Reilly property (Tr., Watson, pp. 136, 174; Sharpe, pp. 95–97). The subsurface underneath the Velsicol property including the former Reilly property is characterized as Karst terrain (Tr., Crawford, p. 583).

13. In September 1974 Betts Engineering Co. ("Betts") conducted a study of the surface water runoff from Velsicol property (PX 124). In July 1975 Betts did a follow up study (PX 125). Both of these studies concerned the abatement of contaminated storm water runoff and discussed storm water runoff from the Velsicol facility onto the Reilly property.

14. For various reasons, in the early 1970s, Reilly became interested in selling the Reilly Tar facility. One of the primary reasons was lack of economic viability of the plant. The facility was very small, the continuing supply of coke was in jeopardy, and the plant was of marginal profitability. Pollution matters also entered into the decision. Had Reilly continued operations it would have had to expend a significant amount of money to come into compliance with newly enacted environmental laws (Tr., Varnell, pp. 693–94; Polack, pp. 1201–02).

15. In 1971, T.J. Ryan, Vice President of Reilly, met with Robert H. Wecker, Velsicol's Director of Corporate Development, and Robert M. Morris, Velsicol's Board Chairman, for the purpose of exploring the possible sale of the Reilly property and continuing the production opera-

tion (Defense Exhibit "DX" 1). In July 1971, Mr. C.L. Dickenson, Velsicol's Vice President of Manufacturing and Engineering and Mr. L.M. Reed, Velsicol's Director of Engineering, toured the Reilly facility (PX 65).

16. For its own reasons, Velsicol was also interested in purchasing the Reilly property. However, after the 1971 preliminary purchase exploration, Velsicol terminated discussions without an agreement to purchase (PX 66).

17. In 1972 Velsicol demonstrated renewed interest in purchasing the Reilly property. In May 1972, after internal discussion within Velsicol, manufacturing officials asked Velsicol's legal department to pursue a purchase of the property (PX 69).

18. Velsicol General Counsel Neil R. Mitchell was head of the Velsicol Legal Department at that time. Following up the request from the manufacturing officials, on June 1, 1972 Mitchell sent a written proposal to Reilly officials outlining the terms of Velsicol's potential purchase of the Reilly property (Tr., Mitchell, pp. 402–03; PX 71).

19. Reilly responded to Mitchell's letter in a June 5, 1972 letter written by T.J. Ryan (PX 72). In its response, Reilly expressed interest in Velsicol's offer but indicated it wanted to sell the property in an "as is" condition at the time of sale.

20. Mitchell agreed with the changes proposed by Ryan in a June 9, 1972 letter (PX 73). This letter accepted the "as is" language proposed by Ryan. Mitchell stated he would prepare a formal contract of sale and forward it to Reilly for review and execution (Tr., Mitchell, p. 405).

21. Mitchell's letter also referenced an oral agreement to allow Velsicol equipment and supplies to be placed on the west one hundred feet of the Reilly property so that Velsicol's plant expansion could proceed in an orderly manner (*Id.* at 402–03; PX 73).

22. Mitchell obtained the services of the Chattanooga law firm of Witt, Gaither, Abernathy & Wilson to draft the necessary

documents to convey the property. E.L. Kittrell Smith of that law firm was assigned primary responsibility for the actual drafting of the contract of sale (PX 75; Tr. Mitchell, p. 408).

23. Velsicol submitted its first draft contract of sale prepared by Smith for the Reilly property on July 10, 1972 (*Id.* at 409; PX 76). The draft contract did not contain the "as is" language proposed by Ryan nor did it provide that the property was to be sold in an "as is" condition (PX 76).

24. Paragraph 8(c) of the July 10, 1972 draft contract provided:

That all the property described herein at the time of closing will conform with all applicable ordinances, regulations, zoning, and other laws, and at the time of closing there will not be outstanding any notice or order not complied with affecting the use or occupation of any part of such property or requiring any repairs or alterations or improvements thereto.

(*Id.*)

25. On July 19, 1972, Reilly, through Ryan, responded to the July 10 letter by returning the draft with some additions, deletions and other changes (PX 77). Ryan wrote into the margins of the contract an "as is" clause pertaining to the sale. Mitchell sent Ryan's July 19, 1972 letter to Smith and asked Smith to review the changes and advise Mitchell on those changes (PX 78). Smith revised the draft contract but failed to include the "as is" clause (PX 79; Tr. Mitchell, p. 423). This draft did contain permission for Velsicol to use the western 100 feet of the Reilly property for six months in 1972 as a "staging area" for an expansion project (PX 79, ¶ 9).

26. Over the next several months no action took place regarding the sale of the property. Ryan made many efforts to check on the progress of the negotiations (Tr., Mitchell, pp. 430–31; PX 81, 82, 84, 85). Mitchell had not received authorization from Velsicol's parent corporation, Northwest Industries, to conclude the purchase, so Mitchell avoided responding to Ryan's several letters and telephone calls (Tr., Mitchell, pp. 426–27).

27. On September 15, 1972, Velsicol's corporate parent denied permission for Velsicol to purchase the property (PX 83). Velsicol Production management personnel were hopeful they could convince the parent corporation to change its mind so Velsicol did not inform Reilly of the parent corporation's decision (Tr., Mitchell, pp. 429–30). Finally, on August 20, 1973, W. Robb Nisbet, Velsicol Vice President of Manufacturing and Engineering, sent a letter to Ryan confirming a conversation in which he told Ryan Velsicol had no interest in purchasing the Reilly property (PX 87).

28. After the sale fell through, Reilly sought reimbursement for Velsicol's use of the property and requested Velsicol repair any damage to the property caused by Velsicol's use of the property (DX 7; Tr., Mitchell, pp. 467–69). Velsicol ultimately paid $1,500 for the use and restored the Reilly property to its former condition (Tr., Mitchell, pp. 439–440; PX 98)

29. In the early 1970s, both Velsicol and Reilly officials became increasingly concerned about pollution and environmental matters. Air pollution was a concern (Tr., Morris, p. 648) and because of the close proximity of the two operations it was impossible to distinguish which operation was the source of specific pollution. Reilly was also concerned about contamination at the Reilly property that resulted from pollutants being washed onto the Reilly property from the Velsicol Facility through surface water discharges (Tr., Polack, p. 1205; DX 41).

30. Reilly's own off-site wastewater discharges, mainly decant water from storage tanks and water collected from distillation, were subject to monitoring by State of Tennessee officials. Reilly's discharges began to contain elevated, unexplained levels of regulated compounds which Reilly personnel attributed to contamination originating at the Velsicol Facility in the early 1970s (DX 41. 110). Surface water runoff

from the Velsicol Facility washed directly across the Reilly property at several locations, depositing contaminants on the property and leaving visible damage (Tr., Watson, pp. 174–77).

31. Reilly Director of Environmental Control, William Albert Justin, traveled from Reilly headquarters in Indianapolis, Indiana, to Chattanooga in early 1973 specifically to investigate reports of Velsicol pollution at the Reilly property (DX 110). Justin noticed and photographed contaminated water running from the Velsicol facility onto Reilly property. When grass on Reilly's property was exposed to the contaminated water the grass died and turned black (Tr., Justin, p. 1104). The contaminated water was "discolored, basically had a whitish color" (*Id.* at 1106). Justin noted, "[i]t seemed to contain something that killed all vegetation and left the area where the vegetation was killed a very dark, almost black color" (*Id.*).

32. In November 1973, Velsicol requested permission to use a 10 foot strip of Reilly property for a drainage ditch for wastewater from Velsicol's operation. Reilly granted this request. (Tr. Watson, pp. 185–87; DX 73, p. 4). Velsicol used this drainage ditch and continued to deposit chemicals onto the Reilly property (Tr., Watson, pp. 174–77; PX 124 at Exh. C).

33. In January 1974, Velsicol was sued by a large number of homeowners residing near the Velsicol facility. *See Velsicol Chem. Corp. v. Rowe*, 543 S.W.2d 337 (Tenn.1976). The homeowners alleged, *inter alia,* that Velsicol's alleged air surface water pollution was creating a nuisance that adversely impacted the properties and health of the residents in the area. As part of that suit, Velsicol filed a third party complaint against Reilly alleging Reilly's coal tar manufacturing operations were releasing contaminants into the environment (PX 109, p. 2; Tr., Mitchell, pp. 441–42).

34. In August 1974, Velsicol again became interested in purchasing the Reilly property (PX 90). This time Reilly indicated it had no interest in selling the property (PX 91; Tr., Mitchell, pp. 433, 437).

However, still later in 1974 both parties became interested in a sale. Negotiations between Velsicol and Reilly regarding a potential purchase of the Reilly property resumed. Mitchell was involved in other legal matters so he played little or no role in the negotiations. A lawyer on Mitchell's staff, Dietmar Olesch, was primarily responsible within Velsicol's legal department for working out the purchase (*Id.* at 443–44). E.L. Kittrell Smith resumed his work of drafting an appropriate contract and had conversations with Olesch, Reilly personnel and the Chattanooga attorney representing Reilly, Harry Burnette (Tr., Smith, pp. 1146–47).

35. At that time, the State of Tennessee had become concerned about contamination leaving the Velsicol facility through its surface water runoff (DX 69, 73). Pursuant to an investigation under the Tennessee Water Quality Control Act of 1971, State officials identified six discharge points on the Velsicol property for which statutory discharge permits were required (DX 73). Several of these discharge points were for discharges directly onto the adjacent Reilly property (*Id.*).

36. Meanwhile, Velsicol sent another draft contract of sale to Reilly on September 11, 1974 (PX 92; DX 12). Unlike earlier drafts, Paragraph 9 of the September 11, 1974 draft contained the following provision: "it is understood that the land and improvements are being sold on an 'as is' condition at the time of sale" (*Id.*). Paragraph 8(c) from the July 10, 1972 draft remained unchanged, thus requiring that Reilly warrant broadly with respect to its compliance with laws and regulations.

37. On September 30, 1974, Ryan sent a letter to Robert Morris, Chairman of the Board of Velsicol, notifying Velsicol that Reilly had changed its mind, and for business reasons had decided not to sell the property. This letter concluded the second round of negotiations (PX 96). Velsicol nevertheless secured permission from Reilly to use the staging area from December 1974 through May 1975 at a similar

price for the completion of another construction project (PX 98, 99).

38. In late 1974, State of Tennessee officials advised Velsicol the drainage ditch along the Reilly property would be considered a separate discharge point, for which a separate water discharge permit would be required, unless Reilly granted Velsicol an easement for the discharge (DX 73; Tr., Watson, pp. 186, 190). In May 1975, the State of Tennessee directed Velsicol to approach Reilly to determine whether Reilly would grant Velsicol an easement for the areas on the former Reilly property impacted by surface water discharges from the Velsicol Facility.

39. Velsicol contacted Reilly to request an easement from Reilly (DX 32). Reilly refused to grant Velsicol an easement for the further discharge of contaminants onto the Reilly property (Tr., Mitchell, p. 443; DX 32). Reilly complained Velsicol had caused pollution problems on the Reilly property and Reilly believed it might be liable for the cleanup of its property, including contamination caused by Velsicol (Tr., Polack, p. 1205). Reilly further informed Velsicol the pollution problems on the Reilly property caused by Velsicol's surface water discharges would be obviated if Velsicol wished to purchase the property (DX 17, 32). Velsicol's General Counsel, Neil Mitchell and Velsicol executive Robert Morris, agreed to proceed with the purchase of the Reilly property (Tr., Morris, pp. 651–53).

40. In 1975, Velsicol was an experienced, sophisticated chemical manufacturing company and was familiar not only with the then existing environmental laws but also anticipated that the future portended additional and more stringent environmental laws and regulations (Tr., Morris, pp. 646–47; Smith, p. 1177). Velsicol was also at that time very familiar with the condition of the Reilly property and was aware of potential environmental and pollution issues both at its site and the Reilly property (Tr., Watson, p.149). Velsicol knew the Reilly property had been used for many years as a coal tar refinery (*Id.*).

Velsicol was aware of the flow of water onto the Reilly property (*Id.* at 155). Velsicol plant manager Garland Watson inspected the Reilly property in connection with Velsicol's purchase at the request of Velsicol General Counsel Neil Mitchell (*Id.* at 152). During his site visit, Watson observed what appeared to be coal tar materials on the ground at the Reilly property and that "you couldn't miss it" (*Id.* at 150). Watson reported his observations to Mitchell at Velsicol's headquarters (*Id.* at 155).

41. In furtherance of the desire to proceed with the purchase, Velsicol resumed negotiations for the purchase of the Reilly property in June 1975, with knowledge of its need to continue discharging across the Reilly property (PX 104–106; DX 32). Velsicol and Reilly agreed to use the September 1974 draft contract as a starting point for expedited negotiations in June 1975.

42. In July 1975, Velsicol forwarded a draft contract for sale to Reilly for its consideration (PX 108). After reviewing the draft contract and considering the circumstances surrounding the sale, Reilly's General Counsel, Robert Polack, concluded the language of the agreement, particularly in Paragraph 8(c), did not provide Reilly with sufficient protection against potential pollution claims. In short, he would not agree to warrant compliance with laws, including environmental laws (Tr., Polack, pp. 1198–1200). Polack was concerned about contamination at the Reilly property which had resulted directly from Velsicol's own adjacent chemical manufacturing operations (*Id.*).

43. On July 29, 1975, Polack advised Smith, Velsicol's attorney primarily responsible for drafting the Reilly/Velsicol contract, that Reilly would not agree to the language of the proposed contract. He explained Paragraph 8(c) would have to be modified to exclude pollution liability, so that all future costs in that regard would be paid by Velsicol (Tr., Smith, pp. 1152–53; Polack, pp. 1202–03; PX 108). Polack

informed Smith that Reilly was leaving Chattanooga and would not sell the property without protection against future claims for pollution problems (Tr., Polack, p. 1200). Polack informed Smith that Reilly would not sell the property to Velsicol unless Velsicol agreed it would accept all future liability relating to the condition of the property (Tr., Polack, pp. 1203, 1210; PX 108).

44. During this time, Smith had a conversation along the same lines with Harry Burnette, Reilly's local counsel (Tr., Smith, pp. 1154–55). In a August 13, 1975 letter to Mr. Smith, Mr. Burnette proposed a warranty disclaimer provision related to environmental considerations to be included in the contract (*Id.*). Smith understood Reilly's position and relayed it to appropriate Velsicol decision makers, including Dietmar Olesch (Tr., Smith, p. 1168). With knowledge on the part of Smith and Olesch of Reilly's desires and position regarding liability for environmental matters, Velsicol agreed to go forward with the contract as drafted and accepted the language it understood Reilly believed relieved it of responsibility for all future pollution liabilities at the Reilly property (*Id.* at 1159).

45. To effectuate what Smith understood to be the parties' understanding, in August 1974, Smith inserted the language proposed by Burnette into the contract to reflect the parties' agreement that costs associated with the condition of the property would be assumed by Velsicol. The parties' new Paragraph 8(c) became the following:

> That none of the property described herein at the time of closing is in violation of any special, outstanding governmental notices or orders which have not been complied with affecting use of such property. It is clearly understood by all parties that the Seller make no representations or warranties to the usability of the above described property under present or future Federal, State of local

air and water pollution laws, ordinances, or regulations.

(DX 21).

46. The parties believed this complete reversal of Paragraph 8(c) and its reference to pollution matters, coupled with the "as is" release that specifically applied to the "condition" of the "land," protected Reilly against all future claims relating to pollution problems at the property such as the instant lawsuit (Tr., Smith, pp. 1164–65, 1171).

47. Reilly executed the contract of sale on September 25, 1975 ( PX 25). Velsicol executed the contract of sale on October 1, 1975 (PX 115). Closing occurred on December 29, 1975 (DX 46).

48. At some point after the purchase of the Reilly property, Velsicol demolished a storage tank on the former Reilly property that contained a coal tar substance. The contents of this tank were released onto the open ground (Tr., Phelps, pp. 288–89).

49. In 1976 the Resource Conversation and Recovery Act, 42 U.S.C. § 6901 to 6992k ("RCRA") was enacted. In the early 1980s the State of Tennessee required Velsicol to apply for a RCRA Part B permit because it was involved in the treatment, storage and disposal of hazardous waste at its Chattanooga facility (Tr., Phelps, pp. 269, 276). In particular, Velsicol stored hazardous wastes generated by its operations in excess of 90 days. Velsicol first made application for a Part B permit in August 1982 (*Id.* at 276). At that time, the statute and regulations contained no program for "corrective action" regarding sites that might be covered by RCRA (*Id.* at 277).

50. On November 8, 1984, the United States Congress passed the Hazardous and Solid Waste Amendments ("HSWA") to RCRA which created, *inter alia,* a new "corrective action" program (*Id.* at 277; Thiel, p. 223). Thereafter, Velsicol advised the United States Environmental Protection Agency ("EPA") of its intent to withdraw its Part B permit application (PX 40;

Tr., Thiel, p. 223). Instead, Velsicol preferred to operate as a "90 day store" (Tr., Thiel, p. 223). In this way, Velsicol could comply with hazardous waste management requirements by emptying any storage of hazardous waste in 90 days, but Velsicol would not have to obtain a permit (*Id.* at 223–24).

51. Meanwhile, the EPA had delegated authority to the State of Tennessee to administer Part B permit applications. In December 1985, the Tennessee Division of Solid Waste Management requested information from Velsicol on any Solid Waste Management Units ("SWMUs") in accordance with the new RCRA section 3004(u) with regard to the entire Velsicol facility (PX 43). Both the EPA and the state expressed concern over Velsicol's withdrawal of its permit application (PX 41– 42). Velsicol responded to this request by informing the State that section 3004(u) was inapplicable to it because it was not a Part B permittee (PX 44; Tr., Thiel, p. 226).

52. In June 1986, the State of Tennessee scheduled a "show cause" hearing to determine the validity of Velsicol's non Part B status (Tr., Thiel, p. 230). On August 8, 1986, the State of Tennessee advised Velsicol its request for withdrawal of its Part B application was denied because of its inability to meet certain "90– day requirements" under RCRA (PX 53; Tr., Thiel p. 229). In December 1986, Velsicol submitted a revised part B application to the State of Tennessee and the EPA (Tr., Thiel, pp. 230, 238).

53. The Tennessee Department of Environment and Conservation ("TDEC") issued a Final Part B permit to Velsicol on June 28, 1991 (*Id.* at 244). On August 12, 1991, the EPA issued a HWSA (corrective action) permit (PX 58; Tr. Thiel, p. 245). The HWSA permit was issued by the EPA because at that time, HWSA authorization authority resided in the EPA, not the State (*Id.* at 245).

54. As a condition for its Part B RCRA permit, Velsicol was required to conduct a RCRA Facility Assessment ("RFA") at the Velsicol facility and the former Reilly property. The RFA was conducted to identify SWMUs where there may have been releases of hazardous waste constituents. (Tr., Sharpe, p. 64). Sixty-six SWMUs were identified as a result of the RFA, including several on the former Reilly property (Tr., Thiel, p. 264; PX 56). Approximately 25–30 of the SWMUs required further evaluation (Tr., Roush, p. 537). SWMUs 38, 39, 40, and 41 were located on the former Reilly property (*Id.* at 346).

55. After identification of the SWMUs, Velsicol was required to conduct a RCRA Facility Investigation ("RFI") and submit a work plan detailing how Velsicol would respond to the SWMUs identified in the RFA (Tr., Sharpe, pp. 65–66). Velsicol retained an environmental consulting firm called Law Engineering and Environmental Services, Inc. ("LAW Environmental") to conduct the RFI in conjunction with the Memphis Environmental Center ("MEC"), Velsicol's in-house environmental group (Tr., Sharpe, pp. 66–67).

56. The EPA ordered a RCRA Facility Investigation Work Plan in 1992. Pursuant to Velsicol's HWSA permit, Velsicol commenced to work in conjunction with LAW Environmental on a RFI Work Plan which, after numerous changes, was accepted and approved by the EPA on April 29, 1993 (PX 1).

57. LAW Environmental, with the assistance of Velsicol, issued a Phase One report in accordance with the RFI on January 13, 1994 following the acceptance of the Work Plan (PX 2; Tr., Sharpe, p. 68). In its reports, LAW Environmental referred to certain substances it discovered on the former Reilly property as "Coal Tar Dense Non Aqueous Phase Liquids" ("DNAPLs"). The DNAPL was discovered in Monitoring Well ("MW") No. 13. The DNAPL was a viscous, black substance. This designation of "Coal Tar" DNAPL was given before any analysis of the substance was done and was given primarily because the substance was found

on property formerly used to refine coal tar (Tr., Roush, p. 501). In fact the DNAPL did not have the color or smell one would expect with a coal tar DNAPL (*Id.* at 513–15). Velsicol seeks reimbursement for the costs associated with the cleanup of SWMUs 38–41 in this lawsuit.

58. On March 21, 1994, the EPA sent Velsicol a letter indicating that EPA had "reviewed the RCRA Facility Investigation (RFI) dated January 13, 1994" (PX 60). The letter stated the "RFI Report has indicated that significant contamination of soils and groundwater exists at SWMUs # 38, # 39, # 40, and # 41." The letter goes on to recount the discovery of "coal tar DNAPLs" at MW–13 and EPA's field employee's observation of DNAPLs "discharging from the soils into the Pitch Bay Phenol Pond (SWMU # 39) from both sides of the pond." The EPA required Velsicol to submit an Interim Measures Work Plan ("IMWP") for SWMUs 38–41 (*Id.*). These SWMUs were all located on the former Reilly property (Tr., Sharpe, p. 75), and the letter specifically referred to Coal Tar DNAPLs.

59. The letter further states "[d]issolved phase constituents exceed the Maximum Concentration Levels (MCLs) or Subpart S action levels for Benzo(a)anthracene, Benzo(a)pryene, Benzo(b)flouranthene, Benzo(k)fluroanthene, Chrysene, and Pyrene." These six organic chemicals are referred to as polynuclear aromatic hydrocarbons ("PAHs") (Tr., Watson, 122, 124–26; Van Eman, pp. 744, 748–49). These compounds are carcinogens and are very dangerous to the public and the environment (Tr., Harbison, pp. 980–81) The enumerated PAHs are products and/or by-products and/or waste products of coal tar manufacturing. None of the PAHs were ever manufactured by Velsicol at its Chattanooga facility (Tr., Watts, pp. 122, 124–26). This letter directed Velsicol to immediately commence a work plan that would protect the subsoil, the groundwater, and the environment from releases of these hazardous substances from the Reilly property. This letter amounted to a finding by the EPA that the PAHs under the Reilly property created an imminent and substantial endangerment to human health and the environment.

60. Velsicol proffered an Interim Corrective Measures Work Plan on September 16, 1994, which was reviewed by the EPA and the State of Tennessee and determined to be substantially, but not completely, adequate for the purposes of remediating the Reilly property and protecting the public health and the environment from the above enumerated PAHs (PX 62). As a result of the EPA's review of the plan submitted by Velsicol, Velsicol thereupon submitted a Revised Interim Measures Work Plan dated January 30, 1995 (PX 3).

61. Part and parcel of the EPA's Interim Measures Work Plan included a dye tracer study specifically for the Reilly property which encompassed and impacted upon areas far outside of that site (PX 5, 8). A portion of the Interim Measures Work Plan consisted of a DNAPL investigation regarding the Reilly property which eventually led to recovery efforts as to the DNAPLs in the site's groundwater (PX 4, 7). Subsequently, an "Interim Measures Option Selection Report for Groundwater" relative to the Reilly property was issued in September 1997 (PX 6). Ultimately, the EPA, after several public hearings, issued a remedy for the Reilly property which included an asphalt cap, groundwater recovery, continued DNAPL recovery, and long term monitoring of the groundwater (PX 143; Tr., Van Eman, pp. 783–84).

62. In a follow-up letter from the EPA to Velsicol dated December 16, 1994, the EPA indicated it had reviewed the IMWP submitted dated November 28, 1994. However, in response to a statement in the IMWP that the need for groundwater interim measures would be based on groundwater quality at the property boundaries as well as the need for a aquifer pumping test, the EPA responded:

> The EPA would like to point out that monitoring wells surrounding the Reilly Tar area, MW–12, MW–13, MW–14,

MW–15, MW–17, and MW–18, all have site wide constituents such as pesticides, VOCs, and SVOCs that exceed MCLs. The levels of those constituents warrant the implementation of stabilization technologies to prevent the constituents for leaving the facility. While the interim measures was specifically imposed for SWMUs 38, 39, 40, and 41, the interim measures is not intended only for SWMU specific constituents of the Reilly Tar Area, but also for site wide constituents.

(DX 160).

63. Many of these other non-coal tar related contaminants mentioned by the EPA that require remediation at SWMUs 38–41 are unique to Velsicol's operations and cannot be traced in any way to Reilly operation. There are many pesticides and herbicides in the soil, groundwater, DNAPL and sediment at the former Reilly property, in many cases in excess of applicable action levels, which are not attributable to Reilly's operations (Tr., Roush, pp. 506, 511–12, 857, 860–61, 865, 869). Velsicol's operations are associated with the use and presence of, *inter alia*, chlorinated compounds, benzoic acid, benzoyl alcohol, dicamba, benzene, and toluene (Tr., Sharpe, pp. 49–54).

64. Velsicol stored, maintained and loaded and unloaded number 6 fuel oil in two large storage tanks in proximity to SWMU # 38, a fuel oil contaminated drainage ditch. Number 6 fuel oil contains PAHs (Tr., Roush, pp. 556–59).

65. Groundwater underneath the Velsicol Facility has historically flowed and continues to flow under the former Reilly property (*Id.* at 388–89). Contamination caused by Velsicol and Velsicol's predecessors is found in the groundwater underneath the Velsicol facility and in the groundwater under the former Reilly property, in many cases in excess of applicable cleanup or action levels (Tr., Roush, pp. 506, 511–12, 857, 860–61, 865, 869).

66. Watson sampled surface water runoff flowing from Velsicol onto the Reilly property in the 1970s at the request of the State of Tennessee (Tr., Watson, p. 192). The characterization report he submitted to the State indicated Velsicol was discharging dichlorophenol, a hazardous substance under CERCLA directly onto the Reilly property (DX 81). Dichlorophenol has been detected in the "coal tar" DNAPL (DX 171; Tr., Roush, p. 555).

67. Velsicol demolished a storage tank at the former Reilly property that contained coal tar. Velsicol caused the coal tar material to be spilled on the ground (Tr., Phelps, pp. 288–89).

68. LAW Engineering has determined a DNAPL, which it refers to as "Coal Tar DNAPL" exists underneath the former Reilly property. This designation suggests the contamination results from Reilly's former coal tar operation. In fact, however, a significant percentage of the chemical constituents in this DNAPL are not related to coal tar; rather they are the result of contamination caused by the Velsicol facility in the production of chlorinated compounds not associated with coal tar such as benzene and phenyl methyl ester (Tr., Roush, pp. 506–512; DX 171).

69. In its role of fact finder, the Court must make credibility choices, resolve conflicts in the testimony and evidence, reach reasonable inferences from the evidence, and weigh the evidence. In determining credibility the Court considers the traditional factors that guide such decisions, i.e., demeanor, bias, accuracy of recall, support or contradiction by other evidence, inconsistencies in the testimony, and the like.

70. On the issue of the contract language and the context in which the contract was negotiated, drafted and executed, the Court finds the testimony of E.L. Kittrell Smith of critical importance. Unlike the other witnesses who gave testimony regarding the contract, Smith was not and is not an employee of either party. That he is not on the payroll of either Velsicol or Reilly enhances his credibility. This is not to say the Court found Velsicol or Reilly employee witnesses untruthful,

but the Court merely observes a non-employee of a party is traditionally accorded more credibility.

71. Admittedly, Mr. Smith formerly worked as an attorney on behalf of Velsicol, so at one time he was an agent of Velsicol. However his testimony is damaging to Velsicol on the contract interpretation issue. That an agent gives testimony harmful to his principal is also a proper matter for consideration in determining credibility. The court recognizes sometimes disgruntled employees or agents will give untruthful, harmful testimony against their employer or principal. But nothing was brought to the Court's attention regarding Mr. Smith that undermines his testimony. No evidence of bias, prejudice or interest was introduced that would suggest he had a reason to slant his testimony against Velsicol or in favor of Reilly.[4]

72. Mr. Smith's testimony was specific and he had a very clear recollection of the essential events. This is another indicia of reliability. Finally, his testimony was consistent with much of the other evidence and not logically inconsistent with any of the undisputed documentary evidence. Accordingly, the Court accepts Mr. Smith's testimony regarding the contract in full. In accepting Mr. Smith's testimony the Court also credits all testimony and evidence consistent with his testimony and rejects the testimony inconsistent with his testimony. That means the Court finds the following facts and draws the following inferences:

a. Reilly officials told Smith of their desire to be rid of any future entanglements in Chattanooga.

b. Smith understood Reilly desired to be relieved of any future liability for environmental or pollution matters and any other matters.

c. Smith passed this desire onto Velsicol officials, specifically Deitmar Olesch (Tr., Smith, p. 1152).

d. Olesch did not voice any disagreement and accepted Reilly's position because Velsicol had contributed to the pollution at the Reilly property (*Id.* at 1159, 1171).

e. Velsicol, knowing of Reilly's desires and its purpose for placing the "as is" and warranties language in the contract, agreed to accept that language.

f. Velsicol never objected to Reilly or suggested it had a different interpretation of the language prior to the execution of the contract.

g. The parties intention regarding inclusion of the "as is" clause and the warranties clause in the contract was to transfer any future liability for any and all causes of action, including pollution related causes of action, from Reilly to Velsicol.

h. Reilly had every reason to believe its objective of relieving itself of liability had been obtained based upon Velsicol's actions and Velsicol's lack of objections to the contract as drafted.

## CONCLUSIONS OF LAW

Having made the above finding of facts, the Court reaches the following conclusions of law.

■ 1. The threshold issue in this case is whether the language in the sale agreement, specifically paragraphs 8(c) and 9, bars Velsicol's claims in this case. Defendant Reilly argues this agreement clearly

4. After the trial had concluded, the Court allowed Velsicol to submit a sworn statement of Mr. Dietmar Olesch over the objection of Reilly as a rebuttal witness to impeach the testimony of E.L. Kittrell Smith (Court File No. 143). Mr. Olesch had been previously unavailable during trial and was located just as the trial was concluding. The Court has considered Mr. Olesch's testimony but finds it does not detract from or contradict Mr. Smith's testimony in any significant way.

Mr. Olesch did not have any specific recollection of conversations with any Reilly representatives as to why Paragraphs 8(c) and 9 were included in the contract for sale (Olesch Stmt., Court File No. 131, Exh. 2, pp. 55–58). Mr. Olesch spoke in general terms about *his* interpretation of the contract, however, there was no evidence his understanding of the contract was communicated to Reilly officials to put Reilly on notice Velsicol did not intend to transfer environmental liability.

demonstrates the parties intended Reilly would bear no responsibility or liability for any environmental costs associated with the property after the sale. Velsicol contends this agreement speaks only to the "usability" of the property and addresses only air and water pollution and, therefore, does not contemplate hazardous substances, groundwater contamination, or solid waste disposal in connection with the property. Velsicol argues further the "as is" clause is insufficient to transfer CERCLA liability, particularly since the agreement was entered into prior to the enactment of CERCLA.

2. 42 U.S.C. § 9607(e)(1) (CERCLA § 107) states:

(e) Indemnification, hold harmless, etc., agreements or conveyances; subrogation rights

(1) No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposes under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

3. The United States Court of Appeals for the Sixth Circuit has discussed the meaning of § 9607(e) and has held parties can contractually transfer liability under CERCLA, including through the use of "as is" clauses. *AM Int'l, Inc. v. Int'l Forging Equip. Co.*, 982 F.2d 989 (6th Cir.1993); *Niecko v. Emro Mktg. Co.*, 973 F.2d 1296 (6th Cir.1992). The Court must look to applicable state law to determine whether a contractual release is valid to transfer liability. *AM Int'l, Inc.* 982 F.2d at 995–96. The parties do not dispute that Tennessee law is controlling in this case.

4. Under Tennessee law, general rules of contract are used in construing a release. *Richland Country Club v. CRC Equities, Inc.*, 832 S.W.2d 554, 557 (Tenn. Ct.App.1991).

In interpreting a release to determine whether a particular claim has been discharged, the primary rule of construction is that the intention of the parties shall govern, and this intention is to be determined with a consideration of what was within the contemplation of the parties when the release was executed, which in turn is to be resolved in the light of all of the surrounding facts and circumstances under which the parties acted.

*Id.* (quoting *Jackson v. Miller*, 776 S.W.2d 115, 118 (Tenn.Ct.App.1989)). In addition, "where the agreement is plain and unambiguous, the meaning is a question of law and the court should enforce it according to its plain terms." 832 S.W.2d at 557. However, even where the contract language is plain and unambiguous, the terms should still be construed "with reference to the situation of the parties, the business to which the contract relates and the subject matter as appears from the words used." *Id.* (quoting *Petty v. Sloan*, 197 Tenn. 630, 277 S.W.2d 355, 359 (1955)).

5. Velsicol claims paragraph 8(c) in the sales contract, the limitations on warranties clause, deals solely with the "usability" of the property, and only concerns liability under air and water pollution laws. Velsicol further argues the "as is" clause in the purchase agreement cannot be applied prospectively to release Reilly from CERCLA liability since the contract was signed before CERCLA was ever enacted. Reilly contends the "as is" clause is plain and unambiguous, and imposed upon Velsicol an affirmative duty to inspect the property and investigate any potential problems before purchase. Furthermore, the specific mention of present and future pollution laws in the disclaimer evidences a clear intent of the parties to release Reilly of any and all environmental cleanup liabilities.

6. Although discussion of enforcement of "as is" clauses has been limited, several Tennessee state court decisions shed light on this issue. The case of *Jaffe v. Bolton*,

817 S.W.2d 19 (Tenn.Ct.App.1991) involved a lease agreement between a landlord and tenant. The lease agreement specifically provided the premises were leased "as is" and the tenant would "repair, remodel, and maintain premises during the term of lease." The leased property had been burned in a fire and required extensive improvements to comply with building codes and to be suitable for occupancy. The court stated:

> Essentially an "as is" clause means that the buyer or lessee is purchasing or leasing the goods or property as it is in its present state or condition. This generally implies that the property is taken with whatever faults it may possess and implies that the seller or lessor is released of any obligation to reimburse the purchaser or lessee for losses or damages that result from the condition of the goods or property.

817 S.W.2d at 25. The court concluded since the code violations existed at the time the parties entered into the contract, both parties were charged with the knowledge of their existence. Furthermore, since both parties were aware substantial repairs were needed before the property would be in a tenable condition, it was clear the lessee agreed to take the property as it was at the time of the lease agreement, and the tenant could not recoup the costs of improving the property.

7. In another case, *Justice v. Anderson County*, 955 S.W.2d 613 (Tenn.Ct.App. 1997), the Tennessee Court of Appeals enforced an "as is" release against purchasers of school property who later discovered asbestos in the boiler room. Although plaintiffs had inspected the property before the purchase, they failed to inspect the boiler room because it was locked. The court found the presence of asbestos was "reasonably discoverable" and plaintiffs could not rescind the contract since the property was sold "as is" and there was no fraud or misrepresentation on the part of the seller.

8. In *Memphis Zane May Associates. v. Prudential Insurance. Co.,* No. 02A01-

9208–CH–0023, 1994 WL 577449, at *1 (Tenn.Ct.App. Oct.21, 1994), plaintiff purchased real property "as is" with knowledge the defendant had operated a gas station on the property and underground storage tanks were located on the property. The plaintiff sought recovery of sums spent in complying with the Tennessee Petroleum Underground Storage Act, which was not enacted until three years after Plaintiff purchased the property. The court affirmed summary judgment in favor of the defendant, stating:

> The "as is" clause in the contract ... is clear and unambiguous. The clause allocated the burden of loss to [the plaintiff/buyer] and any expense incurred by [the plaintiff/buyer] was incurred as a result of the condition of the premises purchased in the "as is" condition. Such a contract provision is valid and enforceable.

*Id.* at *3.

9. These cases demonstrate Tennessee courts generally enforce "as is" clauses against the purchaser. Purchasers are charged with the duty to investigate the property for problems before purchase, and if the purchaser fails to do so, he or she cannot thereafter complain about costs incurred as a result of defects on the property which were obvious or reasonably discoverable. In spite of how Tennessee courts *generally* interpret "as is" clauses, however, this Court's ultimate duty is to discern the parties' intentions in entering the contract.

10. In discussing these issues at the summary judgment phase of this case, the Court concluded the language of the sale contract did not plainly and unambiguously evince the parties' intent to release Reilly from CERCLA liability, thus the Court looked to extrinsic evidence of the parties' intent. Because the extrinsic evidence was conflicting, the Court found a genuine dispute existed on this issue and summary judgment was therefore inappropriate. Having heard the evidence at length, the Court now concludes the parties intended

to transfer all environmental liability from Reilly to Velsicol and the contract should be enforced to prevent Velsicol's claim in this case.

11. The Court finds the evidence at trial demonstrated the parties intended to transfer all liability relating to the condition of the property, including environmental conditions, to Velsicol. As indicated previously, the Court finds E.L. Kittrell Smith's testimony completely credible and of utmost importance in deciding the contract issue. Mr. Smith testified at length concerning his role in preparing the contract and the intent of the parties as it related to environmental issues.

Q Focusing only on comments, statements or concepts that you discussed with either Mr. Polack or Mr. Burnette, what was discussed between you and those two gentlemen regarding environmental claims or liabilities at the former Reilly site after the closing?

A Reilly was concerned about environmental matters on the property. They had proposed language for insertion in the contract in an attempt to disclaim any liability for those environmental matters. That language survived in the final draft of the contract because Velsicol had been a contributor to the environmental problem and therefore I had no reason to object to the inclusion of the language in the contract that they had requested.

(Tr., Smith, pp. 11–64–65).

12. It is apparent Reilly was planning to leave Chattanooga and Reilly therefore did not want any residual liability connected to its property or operations after the sale. Mr. Polack testified:

Q Mr. Polack, what did you discuss with Mr. Smith, Mr. Burnette, others at Reilly with respect to responsibility for conditions of the property after the closing, including environmental conditions?

A What I discussed with anybody who would listen was that we were concerned about the condition of the property as it was influenced by the Velsicol operations. We wanted to be—We did not want to have any lingering or contingent or continuing responsibility for the property, its usability, it's compliance with laws or anything.

Once we sold it, we were to be done with it. Once we exited operations here in Chattanooga, we wanted to be completely finished with all matters relating to those operations. We wanted to be gone from Chattanooga. Those were the things which I was saying to folks both within our company and it's the conversation I had with Kit Smith.

I tried to make clear my concerns. I understood I was speaking with the drafter of the contract. I was trying to make him understand what my concerns with his draft were. I think he understood those concerns and, as a result, we revised the language and we got—we got what I thought was an acceptable contract because I read the whole thing and I was satisfied with it.

(Tr., Polack, p. 1210).

13. The contract for sale (Paragraph 8(c)) was specifically revised to ensure Reilly did not have any continuing responsibility for environmental conditions related to the Reilly property and any such liability would be transferred to Velsicol. The revised paragraph 8(c) in conjunction with the "as is" clause effectuated the parties intent to transfer liability for any environmental issues from Reilly to Velsciol:

The as-is clause, together with 8(c) as it was amended, and the balance of the contract meant that when the property was conveyed, it was conveyed as-is, and we—and all matters relating to the land went with the land, and when we were gone, we were gone.

(Tr., Polack, p. 1241).

14. The testimony of Mr. Smith and Mr. Polack is further bolstered by a July 29, 1975 letter from Mr. Polack to Mr. Burnette, confirming that Mr. Smith had agreed to modify Paragraph 8(c) "to exclude pollution" (PX 108). While the contract language may be somewhat inartful

by today's standards, almost 25 years later, it is sufficiently clear—when taken in the context of the extrinsic evidence—to effectuate the parties' intent to bar claims such as the instant lawsuit.

15. The Court also concludes pollution problems at the Reilly plant were well known by Velsicol, or at the very least, reasonably discoverable. Velsicol's pre-purchase knowledge of property conditions militates strongly in favor of enforcing the "as is" release. Velsicol knew it was purchasing a coal tar manufacturing operation. Velsicol representatives inspected the property on several occasions prior to the sale. Former Velsicol Plant Manager, Mr. Garland Watson, testified that he personally observed coal tar on the ground on many visits to the Reilly plant before the purchase: "you couldn't miss it." Velsicol even accused Reilly of emitting "solid waste" into the environment in a January 1975 third party complaint against Reilly.

16. Velsicol has offered no direct or extrinsic evidence supporting its position the parties' agreement was somehow limited with respect to environmental claims. The Court notes the Court previously denied Reilly's Motion for Summary Judgment as it related to the contract issue because Velsicol had submitted an affidavit from former Velsicol General Counsel, Mr. Neil Mitchell, disputing Reilly's evidence concerning the parties' intent to transfer environmental liability (Summary Judgment Memorandum, "SJ Memo," Court File No. 75, pp. at 16–18). The Court found Mr. Mitchell's affidavit raised a genuine issue of material fact as to the parties' intentions regarding Velsicol's assumption of environmental liability. At trial however, Mr. Mitchell was unable to shed any light on the parties intentions in drafting the contract. Rather Mr. Mitchell's testimony related primarily to his subjective interpretations of the contract which were not communicated to Reilly personnel. Because Mr. Mitchell did not discuss the relevant contract provisions with anyone at Reilly at any time, the Court did not accept this testimony. (Tr. at 464) *Ward v. Berry & Assoc.*, 614 S.W.2d 372, 375 (Tenn.App.1981). In addition, Mr. Mitchell simply was never asked about many of the other issues discussed in his affidavit. As a result, the Record is devoid of the substantive testimony from the Mitchell affidavit that allowed Velsicol to create a fact question on the parties' intent. In the absence of such testimony at trial, and in light of the strong, convincing testimony of E.L. Kittrell Smith and Robert Polack, the Court finds that judgment for Reilly is appropriate.

17. The Court does not believe a different result is required simply because the contract was executed several years before CERCLA was enacted. The Court has already rejected Velsicol's argument Tennessee courts would not give an "as is" release "prospective application" to a later-enacted statute (SJ Memo, p. 13). To the contrary, at least one Tennessee decision, *Zane May,* and numerous federal decisions have specifically enforced pre-CERCLA "as is" clauses. *See, e.g., Olin Corp. v. Consolidated Aluminum Corp.,* 5 F.3d 10, 15–16 (2d Cir.1993) ("Notwithstanding the fact that CERCLA did not exist at the time these contracts were executed, we hold that ... these contractual provisions are sufficiently broad to encompass CERCLA liability"); *HRW Sys., Inc. v. Washington Gas Light Co.,* 823 F.Supp. 318, 332–33 (D.Md.1993) (retroactive nature of CERCLA liability warrants giving effect to pre-CERCLA releases); *FMC Corp. v. Northern Pump Co.,* 668 F.Supp. 1285, 1291–92 (D.Minn.1987) (unambiguous language of release barred all future claims, including those under CERCLA); *Purolator Prod. Corp. v. Allied–Signal, Inc.,* 772 F.Supp. 124, 131–32 (W.D.N.Y. 1991) ("In view of the breadth of its terms, the fact that the indemnity agreement was entered into prior to the enactment of CERCLA does not prevent its being applied to CERCLA liability"). *See also White Consol. Indus., Inc. v. Westinghouse Elec. Corp.,* 179 F.3d 403, 409 (6th Cir. 1999) (holding a pre-CERCLA assumption provision in a sale contract transferred environmental liability to the purchaser

when the purchase agreement stated buyer would assume "all obligations and liabilities of the Business, contingent or otherwise.")

18. Accordingly, this Court holds Velsicol knowingly accepted liability in 1975 for the site cleanup costs it now seeks to recover from Reilly, and therefore the terms of the parties' agreement bar Velsicol's claims in this action. Because Reilly has proven by a preponderance of the evidence Velsicol's claims are barred by the applicable contract language, judgment in Reilly's favor is appropriate. Since the Court has based its decision in this case on the threshold contract issue, the Court need not address Reilly's liability under § 9607(a), § 9613(f), or Velsicol's third party defense.

For all the aforementioned reasons, the Court **ORDERS** the Clerk of Court to enter judgment in favor of Defendant Reilly Industries, Inc. and to **CLOSE** this case.

**SO ORDERED.**